Colorado Court of Appeals Opinions || September 24, 2015


Colorado Court of Appeals -- September 24, 2015
2015 COA 130. No. 12CA0492. People v. Serra.



 Â 

 
 
 
 COLORADO COURT OF APPEALS

 
 2015 COA 130

 
 




 Court of Appeals No. 12CA0492
 Montrose County District Court No. 10CR325
 Honorable David A. Bottger, Judge


 The People of the State of Colorado,

 Plaintiff-Appellee,

 v.

 Myrl Serra,

 Defendant-Appellant.


 JUDGMENT VACATED IN PART, REVERSED IN PART,
 AND CASE REMANDED WITH DIRECTIONS

 Division I

 Opinion by JUDGE BERGER
 Taubman and Hawthorne, JJ., concur

 Announced September 24, 2015


 Cynthia H. Coffman, Attorney General, Joseph G. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

 Douglas K. Wilson, Colorado State Public Defender, Karen N. Taylor, Chief Appellate Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

 
 Â 

 Â¶1Â Â Â Â Â Â Â Â  Defendant, Myrl Serra, appeals the judgment of conviction entered on jury verdicts finding him guilty of violation of bail bond conditions (a felony), violation of a protection order, and harassment (both misdemeanors).

 Â¶2Â Â Â Â Â Â Â Â  He contends that his convictions must be vacated or reversed because: (1) the evidence is insufficient to support the convictions; (2) the court erred in defining for the jury the term âcontact,â an element of violation of bail bond conditions and violation of a protection order; (3) the trial court erred in allowing the prosecution to introduce evidence of the victimâs character for truthfulness; (4) the court erred in allowing the prosecution to introduce evidence of Serraâs character; and (5) the prosecutor committed prosecutorial misconduct in closing argument.

 Â¶3Â Â Â Â Â Â Â Â  We vacate Serraâs harassment conviction for insufficient evidence. We conclude that there is sufficient evidence to support his convictions for violation of bail bond conditions and violation of a protection order, but we reverse the convictions and remand for a new trial on those charges because of instructional error.Â 

 I. Facts

 Â¶4Â Â Â Â Â Â Â Â  Serra was the elected district attorney for the Seventh Judicial District when he was arrested and charged with unlawful sexual contact and extortion. The victim in this case, who had worked for Serra at the district attorneyâs office for several years before his arrest, was also a named victim in the sexual contact case.

 Â¶5Â Â Â Â Â Â Â Â  Serra was released on a bail bond pending trial. A condition of the bond was that he have âno contact with: [the victim].â A mandatory protection order issued by operation of section 18-1Â­1001, C.R.S. 2015, ordered Serra not to âharass, molest, intimidate[], retaliate against, or tamper withâ the victim and to ârefrain from contacting or directly or indirectly communicating withâ her.

 Â¶6Â Â Â Â Â Â Â Â  Several months before the date of the preliminary hearing in the unlawful sexual contact case, Serra encountered the victim at a department store in Montrose. That encounter formed the basis for the charges in this case, which were tried separately from those in the original case. Serraâs and the victimâs accounts of the encounter differed significantly.Â 

 Â¶7Â Â Â Â Â Â Â Â  The victim testified at trial that although she did not commonly shop at that particular store, she went there that day because she had a gift certificate. She testified that when she and her three sons were about to exit the store, she saw Serra and his son in the parking lot walking toward the store. According to the victim, in an attempt to avoid Serra, she walked to the menâs department because that was the only location in the store she could get to without passing in front of the doors to the store.

 Â¶8Â Â Â Â Â Â Â Â  The victim testified that she âhunched downâ next to a free-standing clothes rack, which was about four-and-a-half to five feet tall. When she saw Serra enter the store about five to ten seconds later, he headed âin the exact direction where [she] was standing with [her] boys.â She testified that she was not sure Serra saw her when he first walked into the store, but she suggested that he saw her when he was walking in her direction in the store.

 Â¶9Â Â Â Â Â Â Â Â  The victim told her sons to go to another part of the store. She testified that because she was watching her sons walk away, she briefly lost sight of Serra. When she next saw him, he was standing at the same clothes rack about three to four feet away from her and one foot above her (she was still hunched over). She testified thatÂ Serra was âkind of movingâ the hangers on the rack but not looking at them. Rather, according to the victim, he was staring at her.

 Â¶10Â Â Â Â Â Â Â Â  The victim testified that Serra stared at her for about ten to fifteen seconds and âsmirkedâ at her before walking away. The victim then left the menâs department, met her sons near the front doors, and exited the store. She testified that Serra was still in the store when she left.

 Â¶11Â Â Â Â Â Â Â Â  On cross-examination, the victim admitted that she had initially told the police that she did not know if Serra had seen her. On redirect examination, she clarified that she meant she was not sure whether Serra had seen her when he walked into the store and first started heading in her direction, but he did see her at some point while he was walking toward her.

 Â¶12Â Â Â Â Â Â Â Â  Serra testified that he had received a twenty percent off coupon to the store, valid only for that day, because he was a regular customer. He testified that when he drove into the storeâs parking lot, he did not see any vehicles he recognized, and he had no reason to believe that the victim was there.

 Â¶13Â Â Â Â Â Â Â Â  Serra testified that he did not see the victim when he walked into the store with his son; he walked to the menâs departmentÂ because they always started their shopping in that section. He testified that he walked past a rack and noticed several shirts on it were shaking. When he stopped walking and turned to look at the rack, he saw a woman bent over, facing away from him. He testified that he did not immediately recognize her, but that from her hair and general body shape, he knew it was either the victim or his ex-girlfriend. According to Serra, he immediately turned around and walked to another section of the store.

 Â¶14Â Â Â Â Â Â Â Â  Serra denied that he walked over to the rack, pretended to look through it, or grabbed, rattled, or touched any of the hangers. He also denied that he stared or smirked at the victim. Both Serra and the victim testified that neither one of them spoke.

 Â¶15Â Â Â Â Â Â Â Â  The only other person who testified to witnessing some of the incident was the victimâs oldest son, who was eleven at the time. He testified that after he and his brothers walked away from the victim, he looked back and saw Serra at the same clothes rack where the victim was standing. He testified that he saw Serra looking in the victimâs direction for about ten to fifteen seconds. On cross-examination, he admitted that he had told the police that he did not remember how long Serra was looking in the victimâsÂ direction. During her cross-examination, the victim testified that before her son was interviewed by the police, he had told her that he did not really remember what had happened at the store.

 Â¶16Â Â Â Â Â Â Â Â  The jury convicted Serra of violation of bail bond conditions under section 18-8-212, C.R.S. 2015; violation of a protection order under section 18-6-803.5, C.R.S. 2015; and harassment (following in or about a public place) under section 18-9-111(1)(c), C.R.S. 2015. The trial court sentenced Serra to imprisonment for one year for violation of bond conditions and imposed concurrent sentences of twelve months and six months for violation of a protection order and harassment, respectively. The court ordered the sentence in this case to be served consecutively to the sentence in Serraâs other case.

 II. Sufficiency of the Evidence

 Â¶17Â Â Â Â Â Â Â Â  Serra argues that the evidence is insufficient to support his convictions. We address this argument first because if there is insufficient evidence, he could not be retried and all other issues would be moot. Although it is a very close question, we conclude that the evidence supports his convictions for violation of bond conditions and violation of a protection order. We agree with SerraÂ that the evidence is insufficient to support his conviction for harassment.

 Â¶18Â Â Â Â Â Â Â Â  âThe due process clauses of the United States and Colorado Constitutions prohibit the criminal conviction of any person except on proof of guilt beyond a reasonable doubt.â Kogan v. People, 756 P.2d 945, 950 (Colo. 1988), abrogated on other grounds by Erickson v. People, 951 P.2d 919 (Colo. 1998). A reviewing court faced with a sufficiency challenge must determine whether the evidence, when viewed as a whole and in a light most favorable to the prosecution, is both substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the charge beyond a reasonable doubt. Dempsey v. People, 117 P.3d 800, 807 (Colo. 2005); People v. Noland, 739 P.2d 906, 907 (Colo. App. 1987). We review the record de novo to determine whether the evidence is sufficient both in quantity and quality to sustain the defendantâs conviction. Clark v. People, 232 P.3d 1287, 1291 (Colo. 2010).

 Â¶19Â Â Â Â Â Â Â Â  In determining whether the evidence is sufficient to sustain a conviction, we âmust give the prosecution the benefit of every reasonable inference that might fairly be drawn from the evidence.â People v. Duncan, 109 P.3d 1044, 1045-46 (Colo. App. 2004). Moreover, âthe resolution of inconsistent testimony and determination of the credibility of the witnesses are solely within the province of the jury.â Id.

 A. Violation of Bond Conditions and Violation of a Protection Order

 Â¶20Â Â Â Â Â Â Â Â  Serra argues that evidence that he happened upon the victim, stared at her for ten to fifteen seconds, made a facial expression, and walked away is insufficient to establish beyond a reasonable doubt that he violated bond conditions and the protection order. We disagree. Viewing the evidence in the light most favorable to the prosecution, as we must, the evidence is sufficient to sustain the convictions.[1]

 Â¶21Â Â Â Â Â Â Â Â  âA person who is released on bail bond . . . and . . . is accused . . . of any felony arising from the conduct for which he was arrestedâ commits the crime of violation of bail bond conditions ifÂ âhe knowingly violates the conditions of the bail bond.â Â§ 18-8Â­212(1).

 Â¶22Â Â Â Â Â Â Â Â  A person subject to a protection order

 commits the crime of violation of a protection order if . . . the person . . . [c]ontacts, harasses, injures, intimidates, molests, threatens, or touches the protected person . . . or violates any other provision of the protection order to protect the protected person from imminent danger to life or health, and such conduct is prohibited by the protection order.

 Â§ 18-6-803.5(1)(a).

 Â¶23Â Â Â Â Â Â Â Â  The prosecutionâs primary theory of guilt was that Serra âcontactedâ the victim and thus violated the âno contactâ provisions of his bond conditions and the protection order.[2] We conclude that the victimâs testimony, which the jury by its verdict determined was credible, provides sufficient evidence that Serra âcontactedâ the victim. See Kogan, 756 P.2d at 950.

 Â¶24Â Â Â Â Â Â Â Â  The term âcontactâ was not defined in the document setting the conditions of Serraâs bond or in the protection order. BecauseÂ both bond conditions and mandatory protection orders are statutory creations, the meaning of their terms must be derived from the applicable statutes. Cf. People v. Kennaugh, 80 P.3d 315, 317 (Colo. 2003) (interpreting terms of probation).

 Â¶25Â Â Â Â Â Â Â Â  The term âcontactâ is not defined in any of the relevant statutes. See Â§ 18-8-212(1) (violation of bail bond conditions); Â§ 18Â­6-803.5(1)(a) (violation of a protection order); Â§ 16-4-103, C.R.S. 2015 (bond conditions); Â§ 18-1-1001, C.R.S. 2015 (mandatory protection orders). The parties have not cited, and we have not found, any Colorado case that defines the term.

 Â¶26Â Â Â Â Â Â Â Â  âA courtâs primary task in construing a statute is to ascertain and give effect to legislative intent.â People v. Schuett, 833 P.2d 44, 47 (Colo. 1992). To discern the legislative intent, we first look to the language of the statute itself, construing the statutory language according to its commonly accepted and understood meaning. Id. A criminal statute âshould be given that construction which will permit, if at all feasible, the accomplishment of the statutory objective in proscribing certain conduct as criminal.â Id.

 Â¶27Â Â Â Â Â Â Â Â  Both the statutory scheme criminalizing violation of bail bond conditions and the scheme criminalizing violation of a protectionÂ order demonstrate that the General Assemblyâs intent was to, among other things, proscribe conduct that would endanger witnesses or victims of alleged crimes.

 Â¶28Â Â Â Â Â Â Â Â  The bond conditions imposed must âbe sufficient . . . to protect the safety of any person or the community,â and â[t]he court may also consider . . . [a]ny facts indicating that the defendant is likely to intimidate or harass possible witnesses.â Â§ 16-4-103(3)(a), (5)(i), C.R.S. 2015. The mandatory protection order must ârestrain the person charged from harassing, molesting, intimidating, retaliating against, or tampering with any witness or victim of the acts charged.â Â§ 18-1-1001(1). In cases involving unlawful sexual contact like the underlying case here, âfor the protection of the alleged victim or witness,â the court may further order the defendant âto refrain from contact or direct or indirect communication with the alleged victim or witnessâ and enter â[a]ny other order the court deems appropriate to protect the safety of the alleged victim or witnesses.â Â§ 18-1-1001(3)(b), (e).

 Â¶29Â Â Â Â Â Â Â Â  We thus construe the term âcontactâ to effectuate the General Assemblyâs intent to protect the safety of victims or witnesses to alleged crimes.

 Â¶30Â Â Â Â Â Â Â Â  The dictionary defines the verb âcontactâ as, among other things, âto make communication with: get in communication with: reach,â and âto talk or confer with: interview, apply to, approach.â Websterâs Third New Intâl Dictionary 490 (2002). The second group of definitions of the noun âcontactâ is âassociation or relationship (as in physical or mental or business or communication): direct experience through the senses,â and âcondition or an instance of meeting, connecting, or communicating.â Id. Cases from other jurisdictions that have interpreted the term in similar statutory schemes have focused on the communication element of this definition.

 Â¶31Â Â Â Â Â Â Â Â  In Elliott v. Commonwealth, 675 S.E.2d 178, 182 (Va. 2009), the Virginia Supreme Court addressed a protective order that prohibited âcontact of any typeâ with the victim. The court concluded that âcontacts are those acts by the [defendant] that intentionally pierce the protective barrier between the [victim] and the [defendant] fashioned by the protective order.â Id.

 Â¶32Â Â Â Â Â Â Â Â  Applying that definition, the court held that the defendant did not âcontactâ the victim because evidence that he placed himself a block away from her residence, where he was openly visible to her,Â and made several gestures toward the residence was âinsufficient to establish that [he] intended to visually communicate with [her],â as it was undisputed that, in that location, âhe posed no threat of harm to [her] health and safety.â Id. at 181-82.

 Â¶33Â Â Â Â Â Â Â Â  Other courts have similarly concluded that âcontact,â in this context, âinvolves some element of direct or indirect communication and does not merely mean coming within view.â Cooper v. Cooper, 144 P.3d 451, 458 (Alaska 2006); see also C.W.W. v. State, 688 N.E.2d 224, 226 (Ind. Ct. App. 1997) (âContact is defined as âestablishing of communication with someoneâ or âto get in communication with.â Communication occurs when a person makes something known or transmits information to another. Further, communication may be either direct or indirect.â (citations omitted)); Commonwealth v. Basile, 712 N.E.2d 633, 635 (Mass. App. Ct. 1999) (âOur cases generally interpret âcontactâ broadly; there are many ways to achieve a communication.â).

 Â¶34Â Â Â Â Â Â Â Â  Although we decline to formulate a comprehensive definition of âcontactâ that would cover all situations in which a criminal defendant could violate a âno contactâ condition of bond or a protection order, we hold that, to constitute such a violation, theÂ defendantâs conduct must involve physical touching or some element of direct or indirect communication, or attempted communication, with the victim. Consequently, incidental contact that occurs unintentionally and is unavoidable is not sufficient, by itself, to establish a violation.

 Â¶35Â Â Â Â Â Â Â Â  Here, however, the victimâs testimony that Serra placed himself three to four feet away from her, stared at her for ten to fifteen seconds, and smirked at her, coupled with her testimony that she had previously seen him use the same facial expression as a form of communication, was sufficient, although barely, for a reasonable jury to conclude that he communicated, or attempted to communicate, with her.

 B. Harassment

 Â¶36Â Â Â Â Â Â Â Â  Serra also argues that the evidence is insufficient to support his conviction for harassment because it does not establish that he âfollowedâ the victim. We agree that the evidence is insufficient to prove each element of the offense beyond a reasonable doubt.

 Â¶37Â Â Â Â Â Â Â Â  After the prosecution concluded its case-in-chief, defense counsel moved for judgment of acquittal on the harassment charge. The court denied the motion, stating that the jury could concludeÂ from the victimâs testimony that when she walked from the front of the store to the menâs department after seeing Serra outside, âshe would have been visible to Mr. Serra in doing that, and that he ended up where she ended up. And, the jury could conclude that he got there by following her.â

 Â¶38Â Â Â Â Â Â Â Â  As relevant here, â[a] person commits harassment if, with intent to harass, annoy, or alarm another person, he . . . [f]ollows a person in or about a public place.â Â§ 18-9-111(1)(c). Other than the victimâs testimony that Serra saw her when he was walking toward her, the only evidence from which the jury could infer that Serra followed the victim is that he was in the same store as she was and that he approached her at the rack where she was standing. Neither of those facts is adequate to establish beyond a reasonable doubt that Serra followed the victim.

 Â¶39Â Â Â Â Â Â Â Â  Even if we could conclude that the victimâs testimony as a whole sufficiently raised an inference that Serra followed her to the clothes rack, there is no evidence that he did so with the âintent to harass, annoy, or alarmâ her. Id. â[V]erdicts in criminal cases may not be based on guessing, speculation, or conjecture.â Kogan, 756 P.2d at 950 (internal quotation marks omitted). Because anyÂ conclusion we could draw about Serraâs intent would be purely speculative, there is insufficient evidence to support a conviction. We thus vacate Serraâs conviction for harassment.

 III. Definition of âContactâ

 Â¶40Â Â Â Â Â Â Â Â  We now address Serraâs other allegations of error regarding his convictions for violation of bond conditions and violation of a protection order because, although we have concluded that the evidence is sufficient to support those convictions, a new trial nevertheless is required if reversible error occurred during trial.

 Â¶41Â Â Â Â Â Â Â Â  Serra argues that the trial court erred, first, in defining the term âcontactâ for the jury and, second, in forgoing the dictionary definition of the term and giving a broad definition that failed to adequately instruct the jury on the law. We conclude that the instruction given did not correctly instruct the jury on the applicable law.

 Â¶42Â Â Â Â Â Â Â Â  The prosecution submitted a proposed jury instruction defining the term âcontactâ:

 âContactâ means to knowingly be in close, physical proximity of a protected person. For contact to have occurred it is not required that the person who is the named subject of the Court Order or the Bail Bond to haveÂ communicated with the protected person, physically touch the protected person, or to have made eye contact with the protected person.

 The instructionâs stated source of authority was this courtâs opinion in People v. Devorss, 277 P.3d 829 (Colo. App. 2011).

 Â¶43Â Â Â Â Â Â Â Â  The trial court rejected the instruction, emphasizing that the âno contactâ provision at issue in Devorss was part of a sex offender probation order and the fact that the defendant was on probation played a major role in how âcontactâ was construed in that case. The court also pointed out that the language of the no contact provision in Devorss was different from the language of the protection order and bond condition at issue here.

 Â¶44Â Â Â Â Â Â Â Â  The court then explained that it ordinarily would âsimply refer the jury to the ordinary understanding of the meaning of the word, but thatâs problematicâ because the first definition for âcontactâ in the dictionary âwas referring to physical contact.â The court stated that the dictionary definition was ânot a fair definition of the wordâ because it âsuggests that [contact] isâ limited to physical contact.

 Â¶45Â Â Â Â Â Â Â Â  The court concluded that the jury should be instructed âthat contact includes but is not limited to physical contact and leave itÂ at that.â The court proposed an instruction stating that ââcontact,â as used in these instructions, includes a variety of conduct and is not limited to physical touching.â

 Â¶46Â Â Â Â Â Â Â Â  Defense counsel first argued that an instruction defining âcontactâ was unnecessary because it is a word âplainly within the common sense of the jury,â and the legislature chose not to define it. Counsel argued, however, that if âcontactâ was going to be defined for the jury, the courtâs instruction constituted reversible error: â[t]his is in essence telling the jury that . . . something has been found and itâs included herein.â The court responded that âit may beâ reversible error and that it was a âclose questionâ whether to give any instruction at all, but its âbest judgmentâ was to give the jury the instruction as proposed.

 Â¶47Â Â Â Â Â Â Â Â  During closing argument, the prosecutor referred to the definition of contact in the instruction and argued that the term encompassed âa variety of actions and behaviorsâ: âyou can contact somebody by sending a message, verbal or nonverbal. [T]hereâs a variety of ways a human being can contact another without it being a traditional, easily understood form of traditional communication.â The prosecutor argued that that was âwhat [Serra] was doing inÂ terms of contacting [the victim] . . . . He was in close proximity to her, a menacing posture, an intimidating posture, a threatening posture, sending a clear, unequivocal message.â

 Â¶48Â Â Â Â Â Â Â Â  Serra now argues that the court erred in defining the term âcontactâ for the jury, and that it incorrectly defined the term.

 Â¶49Â Â Â Â Â Â Â Â  A trial court has the duty to correctly instruct the jury on all matters of law applicable to the case. People v. Lucas, 232 P.3d 155, 162 (Colo. App. 2009); People v. Pahl, 169 P.3d 169, 183 (Colo. App. 2006). âWe review jury instructions de novo to determine whether the instructions . . . accurately informed the jury of the governing law.â Lucas, 232 P.3d at 162. However, â[t]rial courts also have substantial discretion in formulating the jury instructions, so long as they are correct statements of the law and fairly and adequately cover the issues presented.â People v. Medina, 260 P.3d 42, 47 (Colo. App. 2010) (internal quotation marks omitted). The trial court also has discretion to determine whether the jury should be given additional instructions which properly state the law and adequately cover issues presented. People v. Chavez, 190 P.3d 760, 769 (Colo. App. 2007).

 Â¶50Â Â Â Â Â Â Â Â  âGenerally, instructions phrased in the language of the statute are proper.â People v. Silva, 987 P.2d 909, 917 (Colo. App. 1999). âHowever, if a statutory instruction does not fit a particular case, or if supplementary instructions are needed to state a defendantâs position, then such instructions should be submitted to the jury.â Id. The trial court must instruct the jury on the technical or particular definition of an element of an offense if the element constitutes a term that has acquired a technical or particular meaning, whether by legislative definition or otherwise. See Griego v. People, 19 P.3d 1, 7 (Colo. 2001).

 Â¶51We conclude that the term âcontact,â as used in sections 18-8Â­212 and 18-6-803.5, has a commonly accepted and understood meaning and thus a further clarifying definition was not required to inform the jury of the governing law. See Schuett, 833 P.2d at 47Â­48; see also Devorss, 277 P.3d at 837 (concluding that the word âcontactâ is a common term); People v. Garcia, 197 Colo. 550, 554, 595 P.2d 228, 231 (1979) (common terms should be given the benefit of commonsense understanding).

 Â¶52Â Â Â Â Â Â Â Â  Courts may refer to dictionary definitions to determine the plain and ordinary meaning of undefined statutory terms. People v.Â Gallegos, 260 P.3d 15, 22 (Colo. App. 2010). As discussed above, the dictionary defines âcontact,â to include, among other things, an act of communication. Websterâs Third New Intâl Dictionary 490; see also Cooper, 144 P.3d at 457-58 (ââContacting,â as a verb, means in common usage physically touching or communicating.â (citing Websterâs Third New Intâl Dictionary 490)); C.W.W., 688 N.E.2d at 226 (âContact is defined as âestablishing of communication with someoneâ or âto get in communication with.ââ (citing Websterâs Dictionary 249 (10th ed. 1993))). Defining âcontactâ in accordance with these common and ordinary meanings is consistent with the intent of the General Assembly to protect victims and witnesses of alleged crimes.

 Â¶53Â Â Â Â Â Â Â Â  The trial court therefore was not required to define âcontactâ for the jury, although it had discretion to provide a definitional instruction that properly stated the law. See Chavez, 190 P.3d at 769. The courtâs definition of contact as âincludes [a] variety of conduct and is not limited to physical touching,â however, was not a proper definitional instruction because it did not correspond with the plain and ordinary meaning of the term.

 Â¶54Â Â Â Â Â Â Â Â  By not limiting the definition of contact to the plain and ordinary meaning of the term â physical touching, communicative conduct, or certain communication â the instruction allowed the jury to speculate on what conduct could constitute contact without any meaningful limits on the concept. Although common usage of the term encompasses a broad spectrum of conduct, we do not believe that the General Assembly contemplated that conduct that does not constitute contact under the plain and ordinary meaning of the term, although possibly contact in some other sense of the word, would be sufficient to establish a violation of a bond condition or protection order. Rather, the term must be construed to effectuate the legislative purpose in proscribing contact in specific situations. See Schuett, 833 P.2d at 47-48.

 Â¶55Â Â Â Â Â Â Â Â  As discussed above, the plain and ordinary meaning of the term effectuates the intent of the General Assembly in establishing the offenses of violation of bond conditions and violation of a protection order. Because the jury reasonably could have interpreted the courtâs definition to encompass conduct outside the scope of the plain and ordinary meaning of the term, the instruction did not correctly inform the jury of the governing law. Thus, theÂ trial court abused its discretion in giving this instruction to the jury.

 Â¶56Â Â Â Â Â Â Â Â  Serra preserved this error, and we thus review for harmless error. See People v. Garcia, 28 P.3d 340, 344 (Colo. 2001). âUnder a harmless error standard, reversal is required if the error affected the substantial rights of the defendant.â People v. Gordon, 160 P.3d 284, 288 (Colo. App. 2007). The error thus requires reversal if it created a reasonable probability that the jury could have been misled in reaching a verdict or otherwise contributed to the defendantâs conviction. Garcia, 28 P.3d at 344; People v. Zukowski, 260 P.3d 339, 343 (Colo. App. 2010).

 Â¶57Â Â Â Â Â Â Â Â  Although we have concluded that the evidence minimally supported a finding that Serra âcontactedâ the victim, there were no third party witnesses to the entire encounter (the victimâs son only witnessed a brief portion of the encounter), and the victimâs and Serraâs testimony conflicted on significant issues. Defense counsel successfully impeached the victimâs credibility on several points, and even if we assume the jury believed her testimony, it only provided very tenuous proof that Serra had contacted her. The prosecutorâs statements in closing that contact need not constituteÂ a âtraditional, easily understood form of traditional communicationâ compounded the error by building on the incorrect definition. Thus, in light of the minimal amount of evidence establishing the element of contact, we cannot conclude that the error was harmless.

 Â¶58Â Â Â Â Â Â Â Â  Accordingly, Serraâs convictions for violation of bond conditions and violation of a protection order are reversed.

 IV. Issues Likely to Recur on Remand

 Â¶59Â Â Â Â Â Â Â Â  Because we vacate Serraâs harassment conviction for insufficient evidence and reverse his other convictions for instructional error, we need not determine whether the other alleged errors, by themselves or cumulatively, also require reversal. However, we address some of Serraâs remaining arguments because similar issues may arise on retrial.

 A. Character for Truthfulness

 Â¶60Â Â Â Â Â Â Â Â  Serra argues that the trial court erred in admitting evidence of the victimâs character for truthfulness when the defense had not attacked her character for truthfulness and the evidence exceeded the scope allowed under CRE 608. We agree.

 Â¶61Â Â Â Â Â Â Â Â  The prosecution called three of the victimâs coworkers to testify during its case-in-chief. A. E.-G. testified that she had worked with the victim for three years and with Serra for two years. The prosecutor asked her whether, based on that âthree years of professional interaction,â she had âan opinion as to [the victimâs] truthfulness.â Defense counsel objected on the basis of âvouching,â and the trial court overruled the objection. A. E.-G. then testified that she thought the victim is âincredibly truthful.â The two other witnesses also testified that the victim is a truthful person.

 Â¶62Â Â Â Â Â Â Â Â  The Colorado Rules of Evidence provide specific exceptions to the general rule that evidence of a personâs character is not admissible. Davis v. People, 2013 CO 57, Â¶14 (citing CRE 404(a)). One such exception is provided by CRE 608(a), which permits the admission of opinion or reputation evidence of a witnessâs character for truthfulness, but only âafter the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.â

 Â¶63Â Â Â Â Â Â Â Â  The People argue that evidence of the victimâs character for truthfulness was properly admitted because, before the victimâs coworkers testified, defense counsel repeatedly attacked the victimâsÂ character for truthfulness on cross-examination. They emphasize that defense counsel reminded the victim that she âtook an oath to tell the truthâ and her testimony was given âunder oath,â and that the case was â[n]ot about a personal agenda,â or her âtrying to make [herself] look good in front of [her] bosses.â They also note that defense counsel asked the victim if she made âa promise to [the prosecutor] that [she] would assist him in getting [Serra] convicted on this case,â and referred to the victimâs account of the incident as her âstoryâ and with the qualifier, âaccording to you.â

 Â¶64Â Â Â Â Â Â Â Â  The People also point to questions by defense counsel asking whether the victim told her son what to say before his interview with police and whether it âseemed fairâ that a witness could inform the police hours before trial that there were other witnesses to a crime (apparently referring to the victim telling the police and the prosecutor for the first time the day trial began that she had told three of her coworkers about the incident). Lastly, the People emphasize defense counselâs line of questioning regarding the victim not reporting the incident until the following day, after she had spoken with her coworkers and superiors at the district attorneyâs office (at least one of whom was also a named victim in the original case).

 Â¶65Â Â Â Â Â Â Â Â  We conclude that none of these questions, independently or as a whole, constituted an attack on the victimâs character for truthfulness. Merely questioning a witnessâs credibility does not necessarily constitute an attack on that witnessâs overall character for truthfulness. People v. Miller, 890 P.2d 84, 94 (Colo. 1995); People v. Wheatley, 805 P.2d 1148, 1149 (Colo. App. 1995).

 Â¶66Â Â Â Â Â Â Â Â  âA personâs character with respect to truthfulness means that personâs propensity to tell the truth in all the varying situations of life.â State v. Colon, 284 P.3d 589, 594 (Or. Ct. App. 2012) (internal quotation marks omitted). Consequently, questions during cross-examination that imply a witnessâs testimony is not credible â such as emphasizing the witnessâs oath to tell the truth, potential motives to lie or sources of bias, or questioning his or her failure to disclose certain information to the police â are not necessarily attacks on that witnessâs character for truthfulness. Such questions must do more than attack the truthfulness of the witnessâs testimony, they must attack his or her general propensity to tell the truth. See id.; see also 23 Sheila K. Hyatt, ColoradoÂ Practice Series, Evidence Law Â§ 611:5 (4th ed., 2014) (âNot all impeachment during cross examination opens the door to every mode of rehabilitation. Impeaching the credibility of a witness (showing the witness is lying or inaccurate today) does not permit rehabilitation by showing the witness has a good character for truthfulness.â).

 Â¶67Â Â Â Â Â Â Â Â  Thus, while evidence of â[o]pinion or reputation that the witness is untruthful specifically qualifies as an attackâ under CRE 608, â[e]vidence of bias or interest does not,â and â[w]hether evidence in the form of contradiction is an attack upon the character of the witness . . . depend[s] upon the circumstancesâ of the case. Miller, 890 P.2d at 95 (internal quotation marks omitted). If the rule were otherwise, evidence of truthful character could be introduced any time a witness was cross-examined about inconsistencies in, or contradiction of, his or her testimony, or any time the witness was questioned about facts that indicated that his or her testimony might not be credible. See Wheatley, 805 P.2d at 1149-50. For good reason, this is not the law. See id.; Miller, 890 P.2d at 95.Â 

 Â¶68Â Â Â Â Â Â Â Â  Because defense counselâs cross-examination of the victim did not amount to an attack on her character for truthfulness, testimony that she was a truthful person was inadmissible. Accordingly, on remand, the trial court should not admit evidence that the victim is truthful unless her character for truthfulness is attacked first.[3]

 B. Evidence of Serraâs Character

 Â¶69Â Â Â Â Â Â Â Â  Serra argues that evidence of his bad character was improperly admitted. Specifically, he argues that testimony interpreting what message he conveyed by smirking, that he was âcocky,â and that described previous instances when he had smirked constituted bad character or other acts evidence that should have been excluded. We agree with Serra that testimony about previous incidents when witnesses had seen him smirk was other acts evidence, the admissibility of which the trial court must evaluate under CRE 404(b) if it is offered as evidence on retrial.

 Â¶70Â Â Â Â Â Â Â Â  On direct examination, the prosecutor asked the victim whether she had seen Serra âsmirkâ before this incident, to which she replied affirmatively. The prosecutor asked her to describe the circumstances. The victim answered that she had seen a âcomparable smirkâ from Serra before, more than once, during their professional interaction. The prosecutor asked if it was a look Serra âcommonly everyday used, or was it for special circumstances or events?â The victim replied that â[i]t was special times. It wasnât all the time.â

 Â¶71Â Â Â Â Â Â Â Â  The prosecutor asked the victim to describe the context of her previous experiences seeing Serra smirk. The victim answered:

 When I became the legal secretary for the Ouray docket, I worked directly under Mr. Serra. And, some of the other legal secretaries had more responsibilities . . . for trials or subpoenas, sometimes motions. And, I wanted the opportunity to do that, so I had asked him if I could be given that opportunity. And he said no, that was his job. And then he would smirk at me.

 Â¶72Â Â Â Â Â Â Â Â  The prosecutor then asked the victim what impact the smirk had on her during the encounter at the store. She replied that she felt that the smirk was âvery intimidating,â and that Serra was telling her that âhe was going to get away with itâ and that sheÂ âcouldnât control things.â On redirect examination, the prosecutor asked the victim what the smirk âmean[t] toâ her, and she answered, âthat he was getting away with it, that he â . . . he was cocky.â The prosecutor also asked the victim how she interpreted Serraâs staring; she replied that she thought âit was intimidatingâ and that she guessed it meant âthat he was going to do whatever he wanted to do.â

 Â¶73Â Â Â Â Â Â Â Â  The prosecutor also asked two other witnesses, two of the victimâs coworkers who had also worked with Serra, about whether they had observed Serraâs âsmirk.â They both answered affirmatively.

 Â¶74Â Â Â Â Â Â Â Â  During closing argument, the prosecutor expounded on the victimâs and her coworkersâ testimony about Serraâs smirks.

 Â¶75Â Â Â Â Â Â Â Â  Defense counsel objected to most of this testimony under CRE 404(b). The trial court overruled the objections to the victimâs testimony, concluding that it did not implicate CRE 404(b). The court sustained the objections to some of the coworkersâ testimony on relevancy grounds.

 Â¶76Â Â Â Â Â Â Â Â  We conclude that the testimony about the witnessesâ prior experiences with Serraâs smirk constituted âother actsâ evidence subject to CRE 404(b).

 Â¶77Â Â Â Â Â Â Â Â  CRE 404(b) prohibits the admission of â[e]vidence of other crimes, wrongs, or acts . . . to prove the character of a person in order to show that he acted in conformity therewith.â Evidence of other acts may be admissible for other purposes, such as to show motive, intent, or knowledge. Id.

 Â¶78Â Â Â Â Â Â Â Â  The People argue that the testimony did not involve criminality or prior âbadâ acts and thus it did not fall under CRE 404(b). But â[t]o fall within the scope of 404(b), an act need not be criminal, so long as it tends to impugn a defendantâs character.â United States v. Kendall, 766 F.2d 1426, 1436 n.5 (10th Cir. 1985). âThe protections of CRE 404(b) recognize that it is unfair to require a defendant to disprove prior acts or explain his or her personality.â Kaufman v. People, 202 P.3d 542, 557 (Colo. 2009). To the extent that the witnesses testified that they had seen Serra smirk before, they were describing prior acts of his that could give rise to an inference of bad character.

 Â¶79Â Â Â Â Â Â Â Â  The testimony was not necessarily inadmissible, however. In light of our discussion above regarding the definition of âcontact,â to establish that Serra contacted the victim, the prosecution was entitled to prove that his conduct constituted communication or an attempt to communicate. To do so, the prosecution could attempt to show that Serra had used the same expression to communicate in the past. Thus, to the extent that the victimâs and her coworkersâ testimony that they had seen him smirk before established that he used a smirk to communicate, the testimony was relevant. But because the testimony discussed prior occasions when Serra had smirked, it referenced other acts of Serraâs that were independent of the encounter that formed the basis for the charges. See People v. Quintana, 882 P.2d 1366, 1373 n.12 (Colo. 1994). CRE 404(b) therefore governs the admissibility of this testimony.

 Â¶80Â Â Â Â Â Â Â Â  The Colorado Supreme Court has prescribed a four-part analysis to determine whether evidence of other acts is admissible under CRE 404(b). People v. Spoto, 795 P.2d 1314, 1318 (Colo. 1990); see also Kaufman, 202 P.3d at 552. If the same evidence is offered on retrial, the trial court must analyze its admissibility under Spotoâs four-prong test. Regarding the fourth prong, theÂ application of CRE 403, the court must ensure that the probative value of any details the witnesses provide about previous encounters with Serra is not substantially outweighed by the danger of unfair prejudice.[4]

 C. Prosecutorial Misconduct

 Â¶81Â Â Â Â Â Â Â Â  We agree with Serra that some of the statements the prosecutor made in closing were improper. We briefly address those statements that are likely to recur on retrial.

 Â¶82Â Â Â Â Â Â Â Â  Considered in the context of a case such as this where the evidence just barely supports the conviction, some of the prosecutorâs statements are troubling. For example, the prosecutor argued that Serraâs conduct conveyed the message that he was invincible, that nobody was going to tell him what to do, and thatÂ the victim needed to alter her behavior. The prosecutor also argued that Serra was trying to intimidate and tamper with the victim to deter her from testifying in the unlawful sexual contact case. Little, if any, evidence supported these arguments.

 Â¶83Â Â Â Â Â Â Â Â  We recognize that a prosecutor properly may ask a jury to draw reasonable inferences from the record. People v. Strock, 252 P.3d 1148, 1153 (Colo. App. 2010). The state of mind, motive, or intent of a person rarely can be proved other than through circumstantial evidence. E.g., People v. Chastain, 733 P.2d 1206, 1212 (Colo. 1987). But here, the prosecutorâs arguments come very close to total speculation. There was no direct evidence that indicated that Serra intended to intimidate or tamper with the victim, nor was the victimâs testimony about what message she believed his conduct conveyed based on any evidence that objectively indicated that her interpretation was a reasonable inference that could be drawn from his behavior. The prosecutorâs drawing of these inferences from the thin evidence presented thus is problematic.

 Â¶84Â Â Â Â Â Â Â Â  Accordingly, on remand, the trial court (and the prosecutor, consistent with the special obligation of prosecutors to effectÂ justice, see, e.g., Wilson v. People, 743 P.2d 415, 418 (Colo. 1987)) must carefully consider whether such arguments are proper based on the evidence presented on retrial. To the extent the court determines they are not, the court must prohibit these arguments or strike them and appropriately advise the jury.

 Â¶85Â Â Â Â Â Â Â Â  The prosecutor also made several statements that denigrated Serra and defense counsel and indicated that they were not truthful. For example, the prosecutor stated that Serra âwas absolutely caught being untruthful and less than honestâ and his account was a âstoryâ and âfictionâ; that defense counsel did not have âthe courageâ to ask the victim about some of her testimony from the preliminary hearing; that Serra and defense counsel were âtrying to make [the jurors] take [their] eye off the ball and accept the lie of BS that theyâre feeding [them]â[5]; and that Serra was âliving proof of deceit and dishonestyâ and was âmaking up a story that suits his selfish, narcissistic needs.â

 Â¶86Â Â Â Â Â Â Â Â  â[A] prosecutor cannot communicate [his or] her opinion on the truth or falsity of a witness.â Domingo-Gomez v. People, 125 P.3d 1043, 1049 (Colo. 2005). Moreover, the Colorado Supreme Court has held that âprosecutorial use of the word âlieâ and the various forms of âlieâ are categorically improperâ because the term ânecessarily reflects the personal opinion of the speaker,â âimpl[ies] that the [prosecutor] is privy to information not before the jury,â and âis an inflammatory term likely . . . to evoke strong and negative emotional reactions against the witness.â Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010) (internal quotation marks omitted).

 Â¶87Â Â Â Â Â Â Â Â  Although the terms âBSâ and âdeceitâ are not forms of the word âlie,â they are similarly inflammatory terms that are likely âto evoke strong and negative emotional reactions against the witness.â Id. (internal quotation marks omitted). Accordingly, on remand, the prosecutor must not use the words âlie,â âBS,â âdeceit,â or similar terms to refer to Serraâs testimony or defense counselâs argument. We express no opinion regarding the prosecutorâs use of terms such as âfictionâ and âstoryâ because the propriety of such terms must beÂ evaluated in context of the argument as a whole and the evidence presented at trial, which may differ on retrial.

 Â¶88Â Â Â Â Â Â Â Â  The statements that defense counsel did not have the âcourageâ to ask the victim about her prior testimony and that Serra was making up a story to suit his âselfish, narcissistic needsâ were also improper. Prosecutors âmay comment on the absence of evidence to support a defendantâs contentions.â People v. Samson, 2012 COA 167, Â¶31. However, âit is improper for a prosecutor to assert that opposing counsel knows that the [defendant]âs case is not meritorious.â People v. Ramirez, 997 P.2d 1200, 1211 (Colo. App. 1999). Moreover, âremarks . . . made for the obvious purpose of denigrating defense counselâ are improper, as are arguments implying the defendant has a bad character that thereby âimproperly shift[] the focus of [the juryâs] attention from the evidence in [the] case.â People v. Jones, 832 P.2d 1036, 1038-39 (Colo. App. 1991).

 Â¶89Â Â Â Â Â Â Â Â  References to a defendantâs or defense counselâs diversionary tactics also are improper when used as a means to denigrate the defendant or defense counsel; they are not improper if, viewed in context, they are attempts to draw the juryâs focus to relevantÂ evidence. People v. Allee, 77 P.3d 831, 836 (Colo. App. 2003); People v. Perea, 126 P.3d 241, 248 (Colo. App. 2005). To the extent that the prosecutorâs statements that Serra and defense counsel were trying to distract the jury constituted the former, they were improper.

 Â¶90Â Â Â Â Â Â Â Â  Accordingly, on retrial, the prosecutor must refrain from any argument âcalculated to inflame the passions or prejudice of the jury, to divert the jury from its duty to decide the case on the evidence, or to seek a conviction based on matters irrelevant to determination of [Serraâs] guilt.â People v. Rosales, 134 P.3d 429, 435 (Colo. App. 2005).

 V. Conclusion

 Â¶91Â Â Â Â Â Â Â Â  Serraâs conviction and sentence for harassment are vacated, and the trial court is directed on remand to enter judgment of acquittal on that charge. His convictions for violation of bail bond conditions and violation of a protection order are reversed, and the case is remanded for a new trial on those charges.

 JUDGE TAUBMAN and JUDGE HAWTHORNE concur.


 [1] Relying on People v. Lacallo, 2014 COA 78, Â¶Â¶4-23, the People argue that because Serra did not move for a judgment of acquittal on the charges of violation of bail bond conditions and violation of a protection order (or otherwise raise the issue of sufficiency in the trial court), we should review only for plain error. We disagree with Lacalloâs holding that unpreserved sufficiency arguments may be reviewed only for plain error and instead follow other divisions of this court that have concluded that âsufficiency of the evidence claims are not governed by plain error review.â People v. McCoy, 2015 COA 76, Â¶6.

 [2] In closing argument, the prosecutor alternatively argued that Serra violated the protection order by harassing, intimidating, or molesting the victim. However, he devoted the majority of his time to arguing that Serra violated bond conditions and the protection order by âcontactingâ the victim.

 [3] We also note that some of the testimony by the witnesses went beyond what CRE 608 permits by addressing the victimâs general character, not her character for truthfulness. For example, A. E.-G. testified that the victim has a âgreat amount of integrity,â and that she âhandles a lot of very private, confidential information, and [A. E.-G. had] never heard her share confidential information with anyone [or] have a problem with that at all.â

 [4] We do not address the admissibility of the victimâs testimony about how she interpreted Serraâs smirk (that it was âintimidating,â that she believed it meant that he was going to âget away with it,â that he was cocky, etc.). Testimony about how she reacted to the smirk (for example, that she felt intimidated) may be relevant because of the alternate ways by which Serra could have violated the protection order (harassing, molesting, intimidating, retaliating against, or tampering with the victim). If, on retrial, evidence is presented on the victimâs perception of Serraâs intentions and beliefs, the court must consider whether CRE 403 permits the admission of such evidence (although the evidence is not other acts evidence requiring a full CRE 404(b) analysis).

 [5] The People quote this statement as âaccept the li[n]e of BS.â However, the transcript contains the term âlie,â and the People do not provide any argument or evidence why we should conclude that the prosecutorâs statement was misquoted in the transcript.




These opinions are not final. They may be modified, changed or withdrawn in accordance with Rules 40 and 49 of the Colorado Appellate Rules. Changes to or modifications of these opinions resulting from any action taken by the Court of Appeals or the Supreme Court are not incorporated here. 



Colorado Court of Appeals Opinions || September 24, 2015


Back