21CA1498 Peo v Foster 08-22-2024 COLORADO COURT OF APPEALS Court of Appeals No. 21CA1498 Mesa County District Court No. 20CR477 Honorable Valerie J. Robison, Judge The People of the State of Colorado, Plaintiff-Appellee, v. Mark Anthony Foster, Defendant-Appellant. JUDGMENT AFFIRMED Division VI Opinion by JUDGE LIPINSKY Freyre and Schutz, JJ., concur NOT PUBLISHED PURSUANT TO C.A.R. 35(e) Announced August 22, 2024 Philip J. Weiser, Attorney General, Carmen Moraleda, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant 
 1 ¶ 1 Mark Anthony Foster appeals his judgment of conviction entered on a jury verdict finding him guilty of first degree murder (after deliberation) and two counts of attempt to influence a public servant. We affirm. I. Background ¶ 2 A jury could have reasonably found the following facts. ¶ 3 Foster and his wife, Roxine Foster, were married for thirty-
nine years. (We refer to Roxine by her first name to differentiate her from Foster. In so doing, we mean no disrespect). ¶ 4 On October 23, 2019, the Fosters were working at the ranch they leased in Grand Junction. Roxine was operating a tractor near Foster, whose SUV was approximately ten to twenty yards behind the tractor. While Roxine was seated on the tractor, a bullet struck and killed her. ¶ 5 Foster later told officers that he heard a gunshot and saw Roxine slump forward and fall off the tractor. He said she was bleeding from her mouth and not breathing when he reached her. Roxine was pronounced dead shortly after the officers arrived. The county coroner later concluded that she died from the gunshot. The coroner recovered a .22 caliber bullet from Roxine’s body. 
 2 ¶ 6 While speaking with the investigating officers, including Lissah Norcross, Taylor Conrad, and Brandon Worley, Foster mentioned various individuals who he said had grudges against him and suggested that one of them may have shot Roxine. (The verdict form for the attempt to influence a public servant charges named Norcross, Conrad, and Worley as the public servants whom Foster attempted to influence.) Foster also told the officers that a stray bullet may have struck Roxine. ¶ 7 Foster named, among other possible suspects, brothers Brad and Leland “John” Smith, who were the Fosters’ former neighbors in Wyoming. Foster said he had been a witness against the Smiths in a federal investigation regarding illegal dumping on Bureau of Land Management (BLM) land, and that he and Roxine moved to Wellington because they feared “retribution.” ¶ 8 Foster also said that, during the federal investigation, someone entered the Fosters’ property in Wellington and Foster “exchanged gunfire with that guy.” According to Foster, no one was injured in the incident and the individual “got away.” Foster said that, although officers investigated the incident, the individual was never found. When one of the officers investigating Roxine’s death asked 
 3 Foster whether anyone was ever prosecuted in connection with the Wellington incident, Foster responded that he was not aware of all the details regarding the federal investigation into the Smiths, but that “they were given probation.” ¶ 9 Officers recovered a .22 caliber Colt M4 rifle from Foster’s SUV. They also seized from the property various types of ammunition, including Remington Yellowjacket .22 caliber bullets. ¶ 10 In addition, an officer interviewed Norma Evans, Roxine’s mother, who lived in a trailer on the ranch. The officer concluded that Evans had not witnessed the shooting. Officers also investigated the leads they obtained from Foster but determined that the suspects Foster suggested were not responsible for Roxine’s death. ¶ 11 Foster was charged with one count of first degree murder (after deliberation) and two counts of attempt to influence a public servant. ¶ 12 At trial, the prosecution’s theory was that Foster murdered Roxine because he had reached a breaking point in his marriage, and that he made false statements about Roxine’s death to the officers to deflect blame from himself. The defense’s theory was 
 4 that Roxine was killed by a stray or ricocheted bullet that an unknown person fired from a distance, and that Foster never attempted to influence the investigation of Roxine’s death by deceiving the officers. ¶ 13 The jury found Foster guilty as charged. II. Analysis ¶ 14 Foster presents four arguments on appeal. He contends that (1) the trial court abused its discretion by denying his motion to depose Evans (the deposition motion), his motion to admit Evans’s video recorded statements into evidence under CRE 807 (the Rule 807 motion), and his request to admit the statements under the “opening the door” doctrine; (2) the trial court abused its discretion by allowing the prosecutor to introduce evidence of the Fosters’ financial and marital troubles, Foster’s character for dishonesty, and photographs of Foster posing with firearms; (3) the trial court plainly erred by allowing the prosecutor to engage in misconduct; and 
 5 (4) the cumulative effect of the alleged errors violated Foster’s right to a fair trial. We disagree with Foster’s first and fourth arguments and agree, in part, with his second and third arguments. However, because we determine that the errors were harmless, whether considered individually or cumulatively, we affirm the judgment of conviction. A. Foster’s Motions Regarding Evans 1. Additional Facts ¶ 15 Defense counsel video-recorded an interview with Evans. During the interview, Evans stated that she was “right there” at the time of the shooting, the shot “came from far off,” and Foster had not killed Roxine. ¶ 16 About ten months after Roxine’s death, defense counsel filed the deposition motion without a supporting affidavit. Defense counsel asserted, “It is believed that [Evans] is in possession of observations and memories that are material and relevant” to the shooting and “are equally relevant to rebut any inference the Government seeks to make concerning a negative relationship” between Foster and Roxine. 
 6 ¶ 17 The deposition motion did not disclose the specific facts about which Evans was allegedly prepared to testify. Rather, defense counsel focused on Evans’s age — eighty-nine years old — and “frail health,” arguing “it is unknown if an appearance at trial would be appropriate for [Evans] or if such an appearance in light of [her] various medical conditions and age would be contraindicated” because those medical conditions “further placed her in an at-risk population during the [COVID-19] pandemic.” ¶ 18 Following a hearing, the court denied the deposition motion because it lacked a supporting affidavit, as Crim. P. 15(a) requires. The court said that, without an affidavit, it was “unable to make a finding as to whether the deposition [was] necessary to protect the health of the witness.” The court did not make findings as to whether Evans may be unable to attend the trial or whether her deposition was necessary to prevent injustice. ¶ 19 Defense counsel filed the Rule 807 motion six months after the court denied the deposition motion, following Evans’s death. The motion revealed the existence and substance of Evans’s recorded statement, in which she claimed to have witnessed Roxine’s shooting. Defense counsel did not contest that Evans’s statements 
 7 on the video recording were hearsay but argued they were nonetheless admissible under CRE 807 — the residual hearsay exception. ¶ 20 In the Rule 807 motion, defense counsel asserted that Evans was “the only witness in the vicinity of the shooting” and that she had “provided evidence that the defense cannot reasonably be expected to procure elsewhere.” Defense counsel argued that Evans had “no motive to be untruthful with regards to the death of her daughter. Therefore, her statements bear particularized guarantees of trustworthiness.” ¶ 21 The court denied the Rule 807 motion because, although certain portions of Evans’s statements on the video recording concerned material facts, they were not “supported by circumstantial guarantees of trustworthiness,” as CRE 807 requires. ¶ 22 The court found that Evans appeared confused on the video recording, she “had a hard time hearing the questions” asked, and Amy Marrs, the Fosters’ daughter, prompted her when she was nonresponsive. Further, the court said that, “while a few of the statements contained in [the] interview are more probative than any 
 8 other evidence which could be reasonably procured, much of the interview is not probative, with large and repeated statements of speculation,” and that “the general purposes of the rules of evidence and interests of justice would not be served by admission of the interview.” ¶ 23 At trial, defense counsel presented an alternative argument for admission of the video recording into evidence: it was also admissible under the “opening the door” doctrine. The prosecutors “opened the door” to admission of the recording, according to defense counsel, by offering the officer’s testimony that, after interviewing Evans, he did not believe she possessed information regarding the shooting. The court disagreed and concluded that the video recording was inadmissible. ¶ 24 On appeal, Foster contends that the court erred by denying the deposition motion, the Rule 807 motion, and the defense’s subsequent request to admit Evans’s video recorded statements under the “opening the door” doctrine. 2. Standards of Review ¶ 25 “We review a trial court’s evidentiary rulings for an abuse of discretion.” People v. Owens, 2024 CO 10, ¶ 105, 544 P.3d 1202, 
 9 1226. “[A] trial court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, unfair, or based on an incorrect understanding of the law.” Id. Questions regarding the interpretation of the Rules of Criminal Procedure or the Rules of Evidence are questions of law subject to de novo review. See People v. Dye, 2024 CO 2, ¶ 34, 541 P.3d 1167, 1175; Gonzales v. People, 2020 CO 71, ¶ 26, 471 P.3d 1059, 1063. 3. The Deposition Motion ¶ 26 Crim. P. 15(a) states that “[t]he prosecutor or the defendant may file a motion supported by an affidavit any time after [an information or complaint] . . . is filed requesting that the deposition of a prospective witness be taken before the court.” The rule provides that “[t]he court may order that a deposition be taken before the court if a prospective witness may be unable to attend a trial or hearing and it is necessary to take that person’s deposition to prevent injustice.” Crim. P. 15(a). ¶ 27 We affirm the court’s denial of the deposition motion because defense counsel failed to establish that taking Evans’s deposition was necessary to prevent injustice. See Moody v. People, 159 P.3d 611, 615 (Colo. 2007) (“[A]ppellate courts have the discretion to 
 10 affirm decisions . . . on any basis for which there is a record sufficient to permit conclusions of law, even though they may be on grounds other than those relied upon by the trial court.”). ¶ 28 Defense counsel vaguely said in the deposition motion, “It is believed that [Evans] is in possession of observations and memories that are material and relevant” to the shooting. But defense counsel did not reveal what those “observations and memories” were or explain why they were “material and relevant.” Moreover, in the deposition motion, defense counsel did not contest the veracity of the officer’s testimony that, after interviewing Evans, he believed she was not aware that a shooting had occurred. ¶ 29 Defense counsel’s argument at the hearing on the deposition motion did not shed light on why preservation of Evans’s testimony was necessary to prevent injustice. When the court asked defense counsel whether Evans “witness[ed] something,” defense counsel responded, “She has stated to officers that she didn’t, we have reason to believe that she may have more to testify to [than] . . . what she told the officers.” Defense counsel, however, did not disclose what Evans would say during a deposition and did not assert that Evans would dispute the officer’s testimony that she 
 11 lacked information regarding the shooting. Thus, the deposition motion and defense counsel’s statements at the hearing on the motion fell far short of showing that Evans’s testimony was necessary to prevent injustice. ¶ 30 Foster cites People v. Hernandez, 899 P.2d 297, 300 (Colo. App. 1995), to address the court’s conclusion that the deposition motion failed for lack of a supporting affidavit. In that case, the division held that the trial court did not abuse its discretion by waiving the affidavit requirement in Crim. P. 15(a) because the party seeking to take the deposition had “thoroughly informed [the court] of the facts and circumstances supporting the request to take the deposition” and the opposing party did not dispute those assertions. Id. Thus, Hernandez stands for the proposition that a court, in its discretion, may grant a Crim. P. 15(a) motion without an affidavit if the missing affidavit would be superfluous. See id. ¶ 31 In Hernandez, both the prosecutor and the witness’s counsel filed Crim. P. 15(a) motions. See id. at 298-99. Those motions, coupled with the prosecutor’s argument at the hearing on the motions, provided the court with detailed information demonstrating that the witness was also a suspect for the murder 
 12 of which Hernandez was accused, had recently been released from custody, was facing imminent deportation from the United States, and was being held at the El Paso County jail solely to secure his testimony. The court noted that the prosecutor’s submission of a supporting affidavit containing the same information would therefore be unnecessary. See id. at 298-300. ¶ 32 Hernandez does not support reversal of the court’s denial of the deposition motion. To the contrary, the level of detail that the prosecutor and counsel for the witness provided to the court in Hernandez only underscores the inadequacy of the information contained in the deposition motion. Because defense counsel conceded that Evans told officers she did not “witness anything” and failed to elaborate what more she might testify to, he did not demonstrate that Evans’s deposition was necessary to prevent injustice. Accordingly, the court did not abuse its discretion by determining that the deposition motion was insufficient without a supporting affidavit. ¶ 33 For these reasons, we affirm the court’s denial of the deposition motion. 
 13 4. The Rule 807 Motion ¶ 34 Hearsay is “a statement other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” CRE 801(c). It is inadmissible unless an exception to the rule applies. CRE 802. One such exception allows the admission of hearsay so long as the statement is backed by “circumstantial guarantees of trustworthiness” equivalent to the more specific hearsay exceptions in other rules of evidence. CRE 807. ¶ 35 When determining the trustworthiness of a statement, “courts should examine the nature and character of the statement, the relationship of the parties, the probable motivation of the declarant in making the statement, and the circumstances under which the statement was made.” People v. Draper, 2021 COA 120, ¶ 82, 501 P.3d 262, 279 (quoting People v. Jensen, 55 P.3d 135, 139 (Colo. App. 2001)), overruled on other grounds by Garcia v. People, 2023 CO 30, 531 P.3d 1031. ¶ 36 We affirm the court’s denial of the Rule 807 motion because defense counsel failed to establish that Evans’s recorded 
 14 statements, which are undisputedly hearsay, were supported by “circumstantial guarantees of trustworthiness.” CRE 807. ¶ 37 The record supports the court’s stated concerns regarding “the circumstances under which the statement was made.” Draper, ¶ 82, 501 P.3d at 279 (quoting Jensen, 55 P.3d at 139). First, the court observed that Evans did not make the statements under oath and the prosecutor had no opportunity to question her about them. Second, as noted above, the court found that Evans appeared confused on the recording. At one point, Evans seemed to be unaware of the reason for the interview. When defense counsel stated, “We are here today to talk about . . . the current charges against [Foster],” Evans responded, “What are the charges against him?” Further, when asked if a police officer spoke to her that day, Evans responded, “No, I don’t think so.” This statement directly contradicted the officer’s testimony that he spent “around five hours, on and off” with Evans on the day of the shooting. Defense counsel likewise never contested that the officer had interviewed Evans. Evans’s poor recall of events on the day of the shooting supports the court’s doubts regarding the trustworthiness of Evans’s recorded statements. 
 15 ¶ 38 More significantly, as the court noted, the video recording captured Marrs, from off camera, prompting Evans when she was nonresponsive to defense counsel’s questions. When defense counsel asked Evans where she was at the time of the shooting, Marrs said, “You came out of the house,” after which Evans parroted, “I came out of the house.” When asked if Evans witnessed Roxine’s death, Evans responded, “I don’t remember.” Marrs then interjected, “We just talked about this a little bit ago Grandma.” ¶ 39 The video recording shows Evans repeating identical phrases, suggesting that she may have been coached. For example, Evans said, “I was there” and “the shot came from far off,” using nearly identical words, more than four times. As the court correctly found, Marrs’s prompting and Evans’s recitation of rote phrases demonstrates that Evans’s statements “are not supported by circumstantial guarantees of trustworthiness.” Accordingly, we need not reach Foster’s arguments regarding the other requirements of CRE 807. ¶ 40 Therefore, we hold that the court did not abuse its discretion by denying the Rule 807 motion. 
 16 5. The “Opening the Door” Doctrine ¶ 41 The “opening the door” doctrine “represents an effort by courts to prevent one party in a criminal trial from gaining and maintaining an unfair advantage by the selective presentation of facts that, without being elaborated or placed in context, create an incorrect or misleading impression.” Golob v. People, 180 P.3d 1006, 1012 (Colo. 2008). “When a party opens the door to otherwise inadmissible evidence, his opponent may then inquire into the previously barred matter.” Id. ¶ 42 However, the concept of “opening the door” does not grant a party “unbridled license to introduce otherwise inadmissible evidence into the trial.” People v. Cohen, 2019 COA 38, ¶ 23, 440 P.3d 1256, 1263 (quoting United States v. Martinez, 988 F.2d 685, 702 (7th Cir. 1993)). The doctrine does not allow the admission of rebuttal evidence that “does not directly contradict the evidence previously received” or “goes beyond the necessity of removing prejudice in the interest of fairness.” Id. (quoting Martinez, 988 F.2d at 702). In short, the doctrine “can be used only to prevent prejudice; it can’t be used as an excuse to inject prejudice into the case.” Id. at ¶ 23, 440 P.3d at 1262-63. 
 17 ¶ 43 Foster argues that the court should have admitted the video recording into evidence to rebut the officer’s testimony that Evans was not a witness to the shooting and was unaware of how Roxine died. ¶ 44 But the officer never testified regarding any controverted substantive statements that Evans made to him or to defense counsel — only that he believed Evans possessed no knowledge of the shooting in the hours following Roxine’s death and that his interview with her did not lead to any other avenues of investigation. Because the officer’s testimony was limited to how his interview with Evans influenced his investigation, and the parties do not contend that the officer became aware of Evans’s recorded statements, the video recording would not have directly contradicted the officer’s testimony. ¶ 45 Relatedly, Foster does not establish that the admission of the video recording was necessary to “remov[e] prejudice in the interest of fairness.” Id. at ¶ 23, 440 P.3d at 1263 (quoting Martinez, 988 F.2d at 702). There was nothing prejudicial in the officer’s assertion that he concluded Evans did not possess any information relevant to the investigation — particularly if he was not aware of 
 18 Evans’s subsequent statements to defense counsel. In contrast, allowing the jury to hear Evans’s hearsay would have injected otherwise inadmissible evidence and prejudice into the case, if only because, as noted in Part II.A.4 above, her statements lacked “circumstantial guarantees of trustworthiness.” CRE 807. ¶ 46 Accordingly, the court did not abuse its discretion by concluding that Evans’s recorded statements were inadmissible under the “opening the door” doctrine. Because the court did not abuse its discretion by denying the deposition motion, the Rule 807 motion, and the request to admit the video recording under the “opening the door doctrine,” we reject Foster’s argument that the court violated his right to a meaningful opportunity to present a complete defense. B. Evidentiary Issues ¶ 47 Foster argues that the court erred by allowing the prosecution to introduce (1) evidence of Foster’s financial troubles; (2) evidence showing a character for dishonesty; (3) photos depicting him with firearms and law enforcement paraphernalia; and (4) evidence regarding the Fosters’ marital strife. 
 19 1. Law and Standard of Review ¶ 48 The U.S. and Colorado Constitutions guarantee criminal defendants the right to a fair trial by an impartial jury. U.S. Const. amends. VI, XIV; Colo. Const. art. II, §§ 16, 23, 25. “A jury that has been misled by inadmissible evidence . . . cannot be considered impartial.” Harris v. People, 888 P.2d 259, 264 (Colo. 1995). ¶ 49 “Evidence which is not relevant is not admissible.” CRE 402. Evidence is relevant if it has “any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” CRE 401. Although relevant evidence is generally admissible, it may be inadmissible under other rules of evidence. See CRE 402. ¶ 50 One such rule is CRE 403, which allows a court to exclude relevant evidence “if its probative value is substantially outweighed by the danger of unfair prejudice.” The rule nonetheless strongly favors the admissibility of relevant evidence. See People v. Vanderpauye, 2023 CO 42, ¶ 59, 530 P.3d 1214, 1229. “For that reason, when considering the balancing required by CRE 403, we give the evidence the maximum probative value attributable to it by 
 20 a reasonable factfinder and the minimum unfair prejudice that may be reasonably expected from it.” Id. at ¶ 59, 530 P.3d at 1228–29. Against this backdrop, “evidence is unfairly prejudicial only if it has an ‘undue tendency to suggest a decision on an improper basis, commonly but not necessarily an emotional one, such as sympathy, hatred, contempt, retribution, or horror.’” People v. Allgier, 2018 COA 122, ¶ 31, 428 P.3d 713, 721 (quoting People v. Dist. Ct., 785 P.2d 141, 147 (Colo. 1990)). ¶ 51 In addition, CRE 404(a) allows courts to exclude relevant evidence of a person’s character or character trait “for the purpose of proving that he acted in conformity therewith on a particular occasion,” absent exceptions not applicable here. ¶ 52 Similarly, CRE 404(b) bars the admission of evidence of “any other crime, wrong, or act” to prove “a person’s character in order to show that on a particular occasion the person acted in conformity with the character.” CRE 404(b)(1). However, other act evidence “may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.” CRE 404(b)(2). This list is not exclusive; “courts can admit uncharged misconduct evidence for 
 21 almost any non-propensity purpose,” subject to the limitations discussed below. Rojas v. People, 2022 CO 8, ¶ 28, 504 P.3d 296, 305. ¶ 53 For other act evidence to be admissible under CRE 404(b), the court must find that the evidence satisfies the four-part test set forth in People v. Spoto: (1) the evidence relates to a material fact; (2) it is logically relevant; (3) its logical relevance is independent of an impermissible propensity inference; and (4) its probative value is not substantially outweighed by the risk of unfair prejudice. 795 P.2d 1314, 1318 (Colo. 1990). This framework is premised upon the requirements of CRE 401 through 404. See Rojas, ¶ 27, 504 P.3d at 304-05. ¶ 54 “We review a trial court’s evidentiary rulings for an abuse of discretion,” which occurs when the court “misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair.” Vanderpauye, ¶ 23, 530 P.3d at 1221. If an erroneous ruling was preserved by objection, to avoid reversal, the People must prove that the error was harmless — that it “did not substantially influence the verdict or affect the fairness of the trial proceedings.” James v. People, 2018 CO 72, ¶ 19, 426 P.3d 336, 341. 
 22 ¶ 55 However, we review unpreserved errors for plain error — those that are obvious and substantial. Hagos v. People, 2012 CO 63, ¶ 14, 288 P.3d 116, 120. An error is obvious if a trial court should be able to avoid it without benefit of objection because the error contravenes a clear statutory command, a well-settled legal principle, or established Colorado case law. People v. Crabtree, 2024 CO 40M, ¶ 42, 550 P.3d 656, 667. “Conversely, when Colorado statutory law or case law would not have alerted the trial judge to an unobjected-to error, the error cannot be deemed plain.” Id. An obvious error affects the substantial rights of the accused and requires reversal only if “an appellate court, after reviewing the trial record in its entirety, can say with fair assurance that the error ‘so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction.’” Id. at ¶ 43, 550 P.3d at 667 (quoting Wilson v. People, 743 P.2d 415, 420 (Colo. 1987)). 2. Evidence of Financial Troubles a. Additional Facts ¶ 56 Defense counsel filed a pretrial motion to exclude evidence of Foster’s “general indebtedness” and opposed the prosecution’s 
 23 notice of intent to admit evidence of Foster’s “financial situation.” The prosecution argued that the financial evidence would show that the couple had a “significant dispute” because of their years of financial problems, establish that Foster did not kill Roxine “by mistake or accident,” and “refute the anticipated defenses of general denial or alternate suspect.” ¶ 57 The court said that the financial evidence is “relevant to show that [Foster] acted after deliberation and with intent, and further that his conduct was not a mistake or accident” because it showed how the Fosters’ relationship had deteriorated; “the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice”; and it does not “implicate ‘other crimes, wrongs, or acts’ as contemplated by CRE 404(b).” The court concluded that the evidence is relevant under CRE 402” and, thus, is admissible under the res gestae doctrine. (As we explain further below, the Colorado Supreme Court subsequently discarded the res gestae doctrine in criminal cases. Rojas, ¶¶ 1-2, 504 P.3d at 300.) ¶ 58 At trial, the prosecution presented substantial evidence of the Fosters’ financial difficulties, including testimony regarding Foster’s evasiveness in making a settlement payment in a civil case; his 
 24 efforts to obtain loans and an advance from his employer; his struggle to pay bills; and the Fosters’ bankruptcy filing in 2015, their loss of property through foreclosure in 2018, and their overdrawn bank balance in 2019. The evidence also included financial documents such as invoices, a promissory note, bank records, and a record of Foster’s earnings from the Department of Labor. ¶ 59 On appeal, Foster contends that the court misconstrued the law and abused its discretion to the extent it admitted the financial difficulties evidence under the res gestae doctrine. He also argues that the court should have excluded the financial evidence because it was irrelevant, inadmissible character evidence, and unfairly prejudicial. b. We Apply Spoto in Light of Rojas ¶ 60 In Rojas, the supreme court explained what type of evidence is subject to CRE 404(b) and admissible under that rule — how courts can determine “when the charged crime ends and ‘other’ acts begin” — in the absence of the res gestae doctrine. Id. at ¶ 42, 504 P.3d at 308. Courts must analyze whether challenged other act evidence is intrinsic or extrinsic to the charged offense. See id. at ¶ 52, 504 
 25 P.3d at 309. If the evidence is intrinsic, meaning that it “directly prove[s] the charged offense” or “occurred contemporaneously with the charged offense and facilitated the commission of it,” courts should evaluate admissibility under CRE 401, 402, and 403. Id. If not, the evidence is extrinsic, and its admission is governed by CRE 404(b) and Spoto. Id. ¶ 61 The financial difficulties evidence was not intrinsic to the charged offenses because it did not directly prove that Foster committed any of the charged offenses. And although Foster may have experienced some of the financial difficulties at the time of the charged offenses, the difficulties did not facilitate the commission of the offenses. Thus, the evidence was extrinsic, and we must consider whether the financial difficulties evidence was admissible under Spoto. c. The Financial Difficulties Evidence Was Admissible Under Spoto ¶ 62 The first two prongs of Spoto are satisfied. As the court correctly determined, the financial difficulties evidence was admissible under CRE 401 and 402 because it was logically relevant to the mens rea element of first degree murder — that 
 26 Foster killed Roxine after deliberation and with intent. See § 18-3-102(1)(a), C.R.S. 2023. The evidence made Foster’s intent to kill Roxine more probable because it supported the prosecution’s theory of Foster’s motive — that the Fosters’ marriage was at a “crisis point” and a “crossroads.” ¶ 63 For example, during closing argument, the prosecutor described evidence showing how Roxine was “insisting on a way of life [the Fosters] couldn’t afford” and how it was “costing an enormous amount of money to try to keep [Roxine] in this [agricultural] lifestyle.” The prosecutor argued that Foster must have felt “desperation” as he was “dealing with this, as this ceiling is crashing down,” and she pointed out that Foster called it a “blessing” when he was able to sell several of the animals days after Roxine’s death. The evidence showing the cause of this “crossroads” in the Fosters’ marriage refuted the defense’s argument that Foster “did not have a motive to kill his wife.” See People v. Villanueva, 2016 COA 70, ¶ 55, 374 P.3d 535, 547 (noting how evidence of motive renders inferences regarding a defendant’s intent more reasonable). 
 27 ¶ 64 Although the court did not analyze it, the third Spoto prong is also satisfied. We acknowledge that the financial difficulties evidence would be inadmissible to prove Foster’s character of wrongdoing and that he acted in conformity with that character when he killed Roxine. See CRE 404(b)(1). But nothing in the record indicates that the prosecution sought to introduce the financial difficulties evidence for that purpose. Rather, as noted above, the prosecution used the financial difficulties evidence for the independent purpose of showing a source of tension in the Fosters’ marriage and, thus, a possible motive for Roxine’s murder. This is a permissible use under CRE 404(b)(2). ¶ 65 The fourth Spoto prong is satisfied as well. Consistent with this prong and CRE 403, the court evaluated the probative value of the financial difficulties evidence and concluded that it was not substantially outweighed by the risk of unfair prejudice to Foster. Giving the financial difficulties evidence its maximum probative value, we reject Foster’s contention that it “added nothing” to the other evidence showing the Fosters’ marital strife. On the contrary, the financial difficulties evidence illustrated one of the reasons why 
 28 Foster reached “a breaking point” and a “crossroads” in his marriage. ¶ 66 Even if the financial evidence created the risk of unfair prejudice by evoking “society’s general stigma against the poor” and painting Foster as “rude, uncooperative, evasive, and dishonest,” as Foster argues, we are not persuaded that the minimum unfair prejudice attributable to the evidence had an undue tendency to suggest a decision on an improper basis. See Vanderpauye, ¶ 59, 530 P.3d at 1228-29; Allgier, ¶ 31, 428 P.3d at 721. Thus, although we might have reached a different conclusion than the court if we were deciding in the first instance how much of the financial difficulties evidence to admit, the court “had substantial discretion to decide this issue,” and we cannot say that the court’s conclusions were “manifestly arbitrary, unreasonable, or unfair.” Owens, ¶ 117, 544 P.3d at 1228. ¶ 67 In sum, because the financial difficulties evidence satisfies the Spoto test, the court did not err by admitting it. 3. Character for Dishonesty ¶ 68 Foster contends that the prosecution’s “extensive evidence that [Foster] told false or exaggerated ‘tall tales’ about his past” was 
 29 irrelevant, unfairly prejudicial, inadmissible character evidence, and improper impeachment. Specifically, he cites the prosecution witnesses’ testimony that Foster told them he had worked in law enforcement, volunteered for a fire department, or served in the military; he had prior run-ins with drug cartels and members of organized crime; and he was in a witness protection program because he was a witness in the federal case. He points to twenty-
seven photos that the prosecution introduced depicting Foster’s military and law enforcement paraphernalia. The prosecution also introduced evidence that Foster did not have any military or law enforcement experience; he exaggerated the seriousness of, and the scope of his involvement in, the federal case; and he was not in a witness protection program. ¶ 69 In challenging the alleged character evidence, Foster also points to testimony regarding two other legal matters in which he was involved. One was the Wellington incident, for which the officers dropped their investigation because of the lack of corroborating evidence. In the other matter, arising from a motorist’s collision with Foster’s cows, Foster allegedly testified falsely during a deposition. 
 30 ¶ 70 The People respond that the evidence about Foster’s “fixation with law enforcement . . . and blame-deflection was relevant and highly probative of Foster’s intent (and ability to carry out the murder)” and also tended to disprove Foster’s theory that a “stray bullet” struck Roxine. They also argue that the prosecution was “entitled to introduce evidence (including of ‘tall tales’) that tended to prove [Foster] used deceit to influence police on how they were investigating the case.” a. Additional Facts ¶ 71 To determine whether the character for dishonesty evidence is relevant and whether it was used for an impermissible purpose, we must examine the arguments and theories that the prosecution presented at trial. ¶ 72 In the prosecution’s opening statement, the prosecutor told the jury that, although Foster attempted to blame others for Roxine’s death, the evidence would show “the people that [Foster] wants to blame either don’t exist, they weren’t in the area or they have some other alibi on the date of the incident.” The prosecutor argued that Foster wanted the officers investigating Roxine’s death to believe “somebody else was to blame for murdering his wife” for 
 31 the purpose of “influenc[ing] their decisions on how they were investigating this case.” ¶ 73 During closing argument, the prosecutor emphasized the inconsistencies among Fosters’ various accounts of Roxine’s death, asserting that he threw out “more names” of possible suspects as he became “desperate” when the investigating officers cleared the individuals whom Foster had previously identified. The prosecutor further asserted that Foster told the officers “stories . . . in an effort to avoid responsibility . . . and to cause them to make decisions that would not lead to the arrest of the person who killed [Roxine], but to other people, to waste time in these side investigations that lead nowhere.” ¶ 74 We next describe the specific character for dishonesty evidence that Foster challenges on appeal. i. Testimony from Officers and Photos of Law Enforcement Paraphernalia ¶ 75 Foster takes issue with certain of the officers’ testimony about their investigation of Roxine’s death. Norcross testified that military paraphernalia was found in the Fosters’ house and that an FBI agent informed her that neither of the Fosters had served in the 
 32 military. In addition, Foster points to twenty-seven photos that the prosecution introduced depicting Foster’s law enforcement paraphernalia and officers’ testimony describing the photos. ¶ 76 Additionally, Worley testified that, when he was walking Foster to the patrol car, Foster made an unprompted “statement about being a witness in a federal trial.” Conrad testified that, when she questioned Foster in the patrol car, Foster started talking about “the Smiths.” ii. Kristopher Hammond ¶ 77 Kristopher Hammond, the lawyer who represented the motorist whose car struck Foster’s cows, testified to the following: • During a deposition in the case arising from the cow incident, Foster testified that he and Roxine were separated. (According to the parties, this testimony suggested that Foster lied under oath because he and Roxine were not separated.) • During that deposition, Foster said he was trained and volunteered as an emergency medical technician (EMT), and that he had been in the federal witness protection program. 
 33 • After Roxine died, Foster accused Hammond of giving her murderer the address where Roxine could be found. • After Foster and the motorist entered into a settlement agreement, Foster repeatedly put off making his settlement payment to the motorist, at one point telling Hammond, “I am under constraints and grief along with fear of my own life and other family members until we have more answers. I am being very careful about releasing any info at this moment.” • On a previous occasion, Foster accused Hammond of working for “Smith Rancho,” which Hammond repeatedly denied. • In all of Hammond’s dealings with Foster, he never met Roxine, never conversed with her over the telephone, never exchanged any messages with her, and had no reason to believe she knew about the lawsuit. iii. Jaydin Connell ¶ 78 The prosecution called Jaydin Connell, who had purchased livestock from the Fosters. Connell testified that, following Roxine’s death, he thought he should provide the “tip line” with “some 
 34 information that [the Fosters] had shared” with him. According to Connell, the Fosters had told him they were “neighbors of the drug cartel,” and that they had “problems with the drug cartel killing cows, and poisoning water.” The Fosters told Connell that they “testified against this . . . drug cartel at some point.” iv. Robert Bonino ¶ 79 The prosecution called Robert Bonino, who sold Foster hay and who obtained a civil judgment against Foster when he failed to pay. Foster had suggested Bonino as a potential suspect to the officers. During his testimony regarding his interactions with Foster, Bonino said that Foster claimed to have served in the military. Bonino also testified that he was not connected with Roxine’s shooting. v. Jeffery Patton ¶ 80 Foster’s coworker Jeffery Patton also testified for the prosecution. Patton described Foster’s stories: Foster was an ex-
deputy marshal; he had killed a Chinese courier who was carrying fentanyl; “there was a contract put on his life after that,” and a Chinese hit man was after him; he was in a “WITSEC” program; an Italian hit man was also after him; when Roxine died, Foster told 
 35 Patton that “they killed her”; Foster shared an article with him regarding a person suspected of killing Roxine; and Foster mentioned that his supervisor’s father may have been involved with Roxine’s death. Patton also testified that Foster “discussed on multiple occasions” that he was an “eight-time champ” at U.S. Marshals Service marksmanship competitions. vi. Amanda Wright ¶ 81 The prosecution called Amanda Wright, who worked at the hospital where Foster was a security guard. Wright testified that Foster told her he worked for the U.S. Marshals Service with Wright’s great-grandfather and great uncle, he was a Marine Corps veteran, and he had won national shooting competitions. According to Wright, Foster gave a presentation to patients about his alleged experience in the Marine Corps. Wright also testified that Foster told her Roxine was shot by people who worked with the drug cartel “that he put away during his service” as a U.S. marshal and who were after him. Wright further testified that Foster shared an article with her about a person who (according to Foster) the officers thought shot Roxine. Foster also told Wright that the officers started to think Roxine’s death was an accident and that the 
 36 sheriff’s office didn’t want to hear about other suspects because they “are scared a guy that is a big part of this deal has a daughter who works for the U.S. Attorney’s office.” vii. Scott Swanson ¶ 82 The prosecution called Special Agent Scott Swanson from the BLM, who became acquainted with Foster when Foster was a witness in the federal case. Swanson testified to the following: • Foster was a witness to a trespass by the Smiths onto BLM land. • The case had nothing to do with drug cartels, fentanyl, or Foster’s alleged role as a U.S. marshal. • The U.S. attorney who prosecuted the federal case decided not to continue using Foster as a witness because of Foster’s “lack of candor,” and Foster never testified against the Smiths at any hearing or trial. • Swanson investigated the alleged attempted murder of Foster in Wellington. Foster told Swanson that a man tried to shoot him, Foster shot him twice in the chest, and the man ran off. 
 37 • Because of a lack of corroborating physical evidence and because Foster was not cooperating, Swanson decided not to pursue the Wellington case. • Foster was not in a federal witness protection program, although the Fosters were given an escort when they moved from Wellington to Fruita and were provided with live-feed cameras on their property. • Several times, Foster called Swanson to report people on his property whom he felt threatened by, but “nothing significant . . . ever happened.” • During his investigation of the Wellington incident, Swanson never came across any evidence that Foster had ever worked for the U.S. Marshals Service. b. The Court Did Not Plainly Err by Admitting the Character for Dishonesty Evidence ¶ 83 Foster does not provide any citations in the record showing that defense counsel objected to the admission of any of the character for dishonesty evidence, other than ten of the photos. We review the court’s admission of the ten photos (together with two additional photos) in Part II.B.4 below. We review the court’s 
 38 admission of the other character for dishonesty evidence for plain error. i. While Certain of the Character for Dishonesty Evidence Was Inadmissible, It Was Not Obvious ¶ 84 We agree with Foster that the photos and certain of the testimony were inadmissible. ¶ 85 First, we agree with Foster that the photos of Foster’s law enforcement paraphernalia were irrelevant. The parties cite no record evidence indicating that Foster ever showed the paraphernalia to anyone. Nor is there evidence that Foster told the officers he was a U.S. marshal or served in the military. Nevertheless, the court did not plainly err by admitting these photos into evidence because their irrelevance was not obvious, particularly as the officers obtained the photos during their investigation, and the prosecution moved to admit them in a group of other photos, the relevance of which Foster does not challenge on appeal. ¶ 86 Second, we agree with Foster that the relevance of the following testimony depended on an impermissible conformity 
 39 inference, and that its probative value was substantially outweighed by the risk of unfair prejudice: • Hammond’s testimony suggesting that Foster lied under oath when he said during his deposition that he and Roxine were separated and that he worked as an EMT; • Bonino’s testimony suggesting that Foster lied to him about serving in the military; and • Wright’s testimony suggesting that Foster lied about serving in the Marine Corps and about winning shooting competitions. ¶ 87 Unlike the other challenged character for dishonesty evidence, the above testimony was irrelevant because Foster told these alleged lies outside the context of Roxine’s death, the alleged lies did not provide a context for Foster’s later statements to these witnesses about his theories regarding Roxine’s death, and the alleged lies did not show that Foster used deceit to influence the officers. Thus, the above testimony was inadmissible under CRE 403 and CRE 404(b). ¶ 88 Nevertheless, we conclude that the propensity inference and unfair prejudice attributable to such testimony was not obvious 
 40 because the challenged statements involved comparatively minor details integrated into the witnesses’ larger narratives (which the prosecutor introduced for non-propensity purposes). Moreover, neither Hammond nor Bonino commented on the veracity of Foster’s statements — their falsity would have only been apparent when considered in conjunction with other evidence. We also reject Foster’s argument that the court abused its discretion by failing to give a limiting instruction pursuant to Rojas, ¶¶ 52, 56, 504 P.3d at 309-10. Rojas does not suggest that a court plainly errs by failing to give a limiting instruction on its own accord regarding evidence that the court admitted without objection and where the impermissible use of the evidence was not obvious. ¶ 89 In sum, the court did not plainly err by admitting the irrelevant photographs and unfairly prejudicial testimony. ii. The Remaining Character for Dishonesty Evidence Was Admissible ¶ 90 Apart from the two categories of evidence noted above, the remaining character for dishonesty evidence was relevant, the relevance did not depend on a propensity inference, and its probative value was not outweighed by the risk of unfair prejudice. 
 41 ¶ 91 First, we reject Foster’s argument that the remaining character for dishonesty evidence was irrelevant. Such evidence falls into four general categories: (1) statements that Foster and others told officers during the investigation into Roxine’s death; (2) Foster’s statements to friends and acquaintances about Roxine’s death, including his theories of who shot her; (3) testimony that provided context or laid a foundation for Foster’s statements about Roxine’s death; and (4) evidence that tended to discredit or disprove Foster’s statements about Roxine’s death. ¶ 92 Such evidence is relevant for multiple purposes. Of primary importance, evidence indicating that Foster knowingly provided false theories and false suspects to the officers tends to establish elements of attempt to influence a public servant: that Foster (1) attempted to influence Norcross, Conrad, and Worley; (2) by means of deceit; (3) with the intent to alter or affect the officers’ decisions and actions when they were investigating Roxine’s death. See § 18-8-306, C.R.S. 2023; People v. Norman, 703 P.2d 1261, 1269 (Colo. 1985). ¶ 93 Further, by discrediting Foster’s claims (whether made to officers or to friends and acquaintances) that various individuals 
 42 had motives for killing Roxine, the prosecution sought to eliminate any reasonable doubts the jury may have had regarding whether Foster was the shooter. Similarly, evidence that Foster suggested false theories and false suspects — based on knowingly exaggerated “tall tales” about people he knew were not likely to be “after him” or who did not exist at all — demonstrated his consciousness of guilt and made it more probable that he shot Roxine. See People v. Summitt, 132 P.3d 320, 324 (Colo. 2006) (noting that a defendant’s conduct that is apparently calculated to avoid detection, arrest, prosecution, or conviction is often relevant in suggesting a guilty mind). ¶ 94 Because the character for dishonesty evidence was probative of material facts — whether Foster shot Roxine and whether he attempted to influence the investigation by means of deceit — the evidence was “relevant and presumptively admissible.” Rojas, ¶ 3, 504 P.3d at 300. ¶ 95 Second, we reject Foster’s argument that the remaining character for dishonesty evidence was impermissible under CRE 404(a) or (b). The relevance of such evidence did not depend on a propensity inference that these rules prohibit — that Foster must 
 43 have a character for dishonesty because he told “tall tales” in the past and, therefore, he must have acted in conformity with that character when he spoke with the officers. Rather, the evidence was relevant for non-propensity purposes: Foster told “tall tales” about the possible suspects and their motives for killing Roxine to deflect his liability for Roxine’s death because of his guilty mind. Moreover, the prosecution offered the evidence of Foster’s statements to the officers — combined with the evidence establishing that such statements were deceitful — as direct evidence that Foster had attempted to influence public servants. Thus, such evidence constitutes “intrinsic acts” falling outside the scope of CRE 404(b). See Rojas, ¶ 44, 504 P.3d at 308. ¶ 96 Third, although it is a closer call whether the risk of unfair prejudice substantially outweighed the probative value of the remaining character for dishonesty evidence, we determine that admission of the evidence was not error — let alone plain error — under CRE 403. Having determined that such evidence was relevant for non-propensity purposes, we are not convinced that the prejudicial effect of the evidence was unfair to Foster. The evidence of the alleged falsehoods that Foster told — although perhaps 
 44 excessive — does not have an undue tendency to suggest a decision on an emotional basis such as hatred, contempt, retribution, or horror. See Allgier, ¶ 31, 428 P.3d at 721. Even Foster characterizes the alleged falsehoods as “tall tales” and “self-
aggrandizing” stories. ¶ 97 Thus, giving the evidence “the maximum probative value attributable to it by a reasonable factfinder and the minimum unfair prejudice that may be reasonably expected from it,” Vanderpauye, ¶ 59, 530 P.3d at 1228–29, the risk of unfair prejudice does not substantially outweigh the probative value. ¶ 98 Fourth, we reject Foster’s argument that the character for dishonesty evidence was improper impeachment under CRE 608, CRE 806, and People v. McLaughlin, 2023 CO 38, 530 P.3d 1206. The prosecution did not introduce the character for dishonesty evidence to impeach Foster. Rather, as explained above, such evidence demonstrated Foster’s consciousness of guilt by showing that he attempted to shift the blame for Roxine’s death onto individuals who he knew had nothing to do with her death or who, like the alleged hit men, did not even exist. It was also direct evidence of Foster’s attempt to influence the officers by deceit. 
 45 ¶ 99 The authorities on which Foster relies are inapposite. CRE 608 only governs evidence of a witness’s conduct and character, and Foster did not testify at trial. CRE 806 is similarly unavailing. Under this rule, when a hearsay statement or certain nonhearsay statements have been admitted in evidence, “the credibility of the declarant may be attacked . . . by any evidence which would be admissible for those purposes if declarant had testified as a witness.” CRE 806. The supreme court held in McLaughlin that, “when a defendant-declarant’s statements are admitted under the rule of completeness, the prosecution may not impeach the defendant-declarant under CRE 806.” McLaughlin, ¶ 4, 530 P.3d at 1207 (emphasis added). But the court did not admit any of the character for dishonesty evidence under the rule of completeness. Rather, the prosecution sought admission of the evidence to prove that Foster committed the charged offenses. ¶ 100 In sum, except as noted, the character for dishonesty evidence was admissible, and the court did not plainly err by admitting such evidence that we hold was irrelevant. 
 46 4. Photos ¶ 101 In addition to the fifteen photos analyzed above, Foster contends that the court erred by admitting twelve other photos. Those photos fall into four categories: • five photos, to which defense counsel objected, depicting Foster with what appears to be U.S. marshal badges and gear (the U.S. marshal uniform photos); • two photos, to which defense counsel objected, depicting Foster in what appears to be his uniform as a security guard (the security uniform photos); • three photos, to which defense counsel objected, showing Foster holding a firearm — two in which he is dressed in U.S. marshal regalia with the firearm pointed to the ground, and one in which he is wearing a security officer uniform with the firearm over his shoulder (the uniform-
firearm photos); and • two photos, to which defense counsel did not contemporaneously object, showing Foster dressed in what appear to be civilian clothes and holding a handgun 
 47 level with his chin pointed at the camera (the aimed firearm photos). ¶ 102 Defense counsel objected to the photos in the first three categories on the ground that they were irrelevant and implicated Foster’s Fifth Amendment right to remain silent. Specifically, defense counsel argued that the prosecution was trying to establish that Foster was representing himself as a U.S. marshal and then to impeach that representation, which would “infringe upon [Foster’s] ability to remain silent” because Foster did not take the photos to show others. Defense counsel further asserted that the prosecution was “opening the door . . . to [Foster’s] credibility and that’s a violation of his self-incrimination rights.” ¶ 103 The court concluded that the photos were relevant and that their admission would not violate Foster’s Fifth Amendment rights because they were not testimonial. ¶ 104 Defense counsel did not object to the admission of the aimed firearm photos. However, he asked the court to “reconsider” their admission after the court excluded a similar photo a few minutes later. The court said, however, it would not reconsider the 
 48 admissibility of the aimed firearm photos “[i]f they’re already admitted.” ¶ 105 On appeal, Foster contends that the uniform and uniform-
firearm photos were admitted for improper impeachment, and that all twelve photos were irrelevant, unfairly prejudicial, and inadmissible character evidence. ¶ 106 First, for the reasons explained in Part II.B.3.b.ii above, we reject Foster’s argument that the photos were used for improper impeachment. ¶ 107 Second, we agree with the People that the uniform-firearm photos and the aimed firearm photos had at least some tendency to show that Foster was “comfortable with guns and was able to use guns,” which “made it more likely that [Foster] was capable and able to use a firearm to kill his wife, rather than the . . . stray-bullet theory.” Accordingly, these photos were relevant — if only marginally so. ¶ 108 However, we agree with Foster that the uniform photos were irrelevant. The U.S. marshal uniform photos were irrelevant for the same reasons as the photos depicting the law enforcement paraphernalia discussed in Part II.B.3.b.i above. The security 
 49 uniform photos were irrelevant because Foster’s employment as a security guard had no connection to the charged offenses and thus did not tend to make any material fact more or less probable. Nevertheless, although the court should have excluded these photos under CRE 402, their admission was harmless because the jury heard admissible testimony about how Foster held himself out as a former U.S. marshal, was employed as a security guard, and owned guns. We do not see how photos showing Foster posing in such uniforms would have evoked the jury’s emotions against Foster any more than did the testimony establishing these same facts. ¶ 109 Third, we disagree that the relevance of the photos depended upon an impermissible inference regarding Foster’s character for dishonesty. As explained in Part II.B.3 above, the fact that Foster held himself out as a former U.S. marshal — which tied into his efforts to suggest that other suspects may have killed Roxine — was relevant for the independent, permissible purpose of suggesting Foster’s consciousness of guilt. And the security uniform photos do not suggest a character of dishonesty because Foster was actually employed as a security guard. 
 50 ¶ 110 Fourth, to the extent the uniform-firearm photos and the aimed firearm photos could have suggested that Foster had a “character for violence and aggression,” Foster did not raise that argument before the court, and we conclude that the court did not plainly err by admitting them into evidence. See Martinez v. People, 2015 CO 16, ¶ 14, 344 P.3d 862, 868 (“Plain error review is equally applicable when a party alters the grounds for his objection on appeal.”). ¶ 111 We are not persuaded that a depiction of an individual holding a firearm, without more, implies that the individual has a character for violence or aggression, particularly when, like Foster in the uniform-firearm photos, the individual is not aiming the gun at an animate target. Even if some viewers might interpret the two aimed firearm photos as showing Foster in “a menacing fashion,” as Foster argues, the propensity inference and risk of unfair prejudice was not obvious because defense counsel affirmatively said he had “no objection” to the admission of the photos, which were admitted in a group with other photos that depicted Roxine smiling. And the court did not abuse its discretion by refusing to reconsider admission of the aimed firearm photos when defense counsel 
 51 objected to their admission after the fact. Accordingly, any error in admitting the uniform-firearm photos and aimed firearm photos was not plain. ¶ 112 In sum, except as noted, the photos were admissible, and the court did not plainly err by admitting the alleged character evidence that we hold was irrelevant. 5. Evidence of Marital Strife ¶ 113 Over Foster’s objection to the admission of any evidence of “discord in [the Fosters’] marriage,” the court allowed the prosecution to introduce communications between the couple in which Roxine expressed anger and frustration toward Foster. The communications, which dated as far back as two years before Roxine’s death, included discussions of divorce, swearing and name-calling, and arguments over housework. On appeal, Foster contends (1) the evidence was improper character evidence that he was a “deadbeat husband” or a cheating spouse who was “likelier to commit crimes”; and (2) the court abused its discretion by failing to limit the evidence “to the most probative time period, such as the three to six months preceding [Roxine’s] death” because the older 
 52 the communications, the more the “probative value decreased, and the risk of unfair prejudice increased.” We disagree. ¶ 114 First, the relevance of the evidence did not depend upon an impermissible character inference. Rather, the prosecution presented the evidence for the independent purpose of showing that the Fosters’ “marriage was coming to an end,” which, the prosecution argued, was why Foster “decided to take actions into his own hands by murdering his wife.” During closing argument, the prosecutor argued that the voicemails and text messages show the “mounting anger, frustration and fear, the breakdown of [the Fosters’] marriage.” The prosecution’s theory of Foster’s motive for killing Roxine was that Roxine treated Foster “like dirt. He [was] demeaned, he [was] called names” until he reached “a breaking point.” ¶ 115 Second, we discern no abuse of discretion in the court’s admission of communications dating as far back as two years before Roxine’s death. As the prosecutor argued in closing, the breakdown of a thirty-nine-year marriage does not “happen overnight or within a couple of days.” It was not manifestly arbitrary, unreasonable, or unfair for the court to admit a two-year 
 53 period of communications to show the mounting problems in the Fosters’ marriage. C. Prosecutorial Misconduct ¶ 116 Foster argues that the prosecutor committed misconduct during closing argument by (1) misstating the evidence; (2) denigrating the defense; (3) appealing to the jury’s emotions; (4) improperly attacking Foster’s credibility; and (5) expressing a personal opinion that Foster was guilty. 1. Standard of Review ¶ 117 We engage in a two-step analysis when reviewing a claim of prosecutorial misconduct. Wend v. People, 235 P.3d 1089, 1096 (Colo. 2010). We determine, first, whether “the prosecutor’s questionable conduct was improper based on the totality of the circumstances and, second, whether such actions warrant reversal according to the proper standard of review.” Id. ¶ 118 Because Foster did not object to any of the statements he challenges on appeal, we review for plain error. See id. at 1097. To warrant reversal under this standard, the prosecutorial misconduct must be “flagrantly, glaringly, or tremendously improper” and cast serious doubt on the reliability of the jury’s verdict. Domingo-
 54 Gomez v. People, 125 P.3d 1043, 1053 (Colo. 2005) (quoting People v. Avila, 944 P.2d 673, 676 (Colo. App. 1997)). 2. Applicable Law ¶ 119 Because “[a]dvocates must be able to present their best case to achieve just results,” prosecutors have “wide latitude in the language and presentation style used to obtain justice.” Id. at 1048. During closing argument, a prosecutor “may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence.” People v. Walters, 148 P.3d 331, 334 (Colo. App. 2006). Prosecutors “can use every legitimate means to bring about a just conviction,” but they have a “duty to avoid using improper methods designed to obtain an unjust result.” Domingo-Gomez, 125 P.3d at 1048. ¶ 120 For example, a prosecutor may not intentionally misstate the evidence or the law, id. at 1048-49; make remarks for the “obvious purpose of denigrating defense counsel,” People v. Jones, 832 P.2d 1036, 1038 (Colo. App. 1991); use tactics calculated to inflame the passions of the jury, People v. Manyik, 2016 COA 42, ¶ 29, 383 P.3d 77, 83; accuse a defendant of having lied, People v. McBride, 228 
 55 P.3d 216, 221 (Colo. App. 2009); or express a personal belief as to the guilt of the defendant, Domingo-Gomez, 125 P.3d at 1049. ¶ 121 “Claims of improper argument must be evaluated in the context of the argument as a whole and in light of the evidence before the jury.” People v. Geisendorfer, 991 P.2d 308, 312 (Colo. App. 1999). We accord prosecutors the benefit of the doubt when their remarks are ambiguous or inartful. McBride, 228 P.3d at 221. 3. The Prosecutor Did Not Flagrantly Misstate the Evidence ¶ 122 Foster contends that the prosecutor asserted facts not in evidence or misstated evidence when discussing during closing argument (1) the distance from which the bullet was fired; (2) the evidence suggesting how long Roxine had been dead by the time officers arrived; and (3) expert testimony on whether the bullet ricocheted. Although we agree that the prosecutor misstated the evidence in the first two instances, those misstatements were not “flagrantly, glaringly, or tremendously improper.” Domingo-Gomez, 125 P.3d at 1053 (quoting Avila, 944 P.2d at 676). We disagree that the prosecutor misstated the evidence in the third instance. Therefore, none of the challenged statements casts serious doubt on the reliability of the jury’s verdict. 
 56 ¶ 123 First, Foster challenges the prosecutor’s assertion that the bullet had “a lot of energy behind it” and was “fired from much closer than a mile or a mile and a half or a mile and a quarter.” The prosecutor did not refer to any evidence supporting this statement, but rather asked the jurors to use their “common sense” about “the energy, the force behind [the] bullet as it tore through [Roxine’s] body.” As Foster notes on appeal, evidence introduced at trial indicated that the bullet could have been fired a mile and a half away from Roxine. ¶ 124 Although we are not persuaded it was proper for the prosecutor to urge the jurors to rely on their “common sense” to determine how far the bullet traveled, the misconduct was not obvious because other evidence allowed the jury to draw a reasonable inference that the bullet was shot from less than a mile away. For example, the jury heard testimony regarding the layout of the land, the trajectory of the bullet, and physical barriers that made it unlikely that the bullet traveled that far. And during closing argument, defense counsel directed the jury’s attention to expert testimony that the bullet could have traveled up to one and a half miles but “[n]ot with any accuracy.” Therefore, the error was 
 57 not plain. (Foster does not develop his related argument that the prosecutor’s statements regarding the distance the bullet traveled improperly suggested that the prosecutor possessed expertise on the topic. The evidence regarding this topic underscores that the prosecutor presented an argument properly grounded in the evidence and was not offering an opinion of her own.) ¶ 125 Second, Foster takes issue with the prosecutor’s statement that, by the time officers arrived at the crime scene, Roxine’s body temperature had already cooled to lukewarm, which, according to the forensic pathologist who conducted Roxine’s autopsy and testified at trial, “takes an hour or more.” The forensic pathologist testified, however, that Roxine’s body would have cooled “probably within an hour or so,” and that blood pooling in a person’s back, as was observed on Roxine’s body, would “give a hint” that the person had “been dead at least for several minutes, an hour or two.” (Emphasis added.) ¶ 126 Allowing the prosecutor to make this misstatement was not an obvious error because the forensic pathologist’s testimony was an approximation of the time it takes a body to cool, and there were signs, apart from the temperature of Roxine’s body, suggesting that 
 58 she may have been dead for more than an hour by the time the first responders arrived. We are not convinced that the misstatement was material because even if, as Foster argues, it “falsely suggested there was evidence [Foster] delayed calling the police after his wife’s death,” the record does not show that the prosecution emphasized this point or asked the jury to infer Foster’s guilt from it. To the extent the prosecutor insinuated that Foster delayed calling the police, she focused on Foster’s statement to the officers that he had gone to the SUV to pick up his phone to call 911, even though the officers later discovered that Foster had in his vest pocket another phone that apparently was not a “work phone,” as he had told the officers. Foster does not challenge such evidence or statements on appeal. ¶ 127 Third, the prosecutor did not misstate the evidence when she asserted during closing argument that the jury heard from “[t]he experts who examined this bullet and told you there is no evidence of ricochet on this bullet.” As the parties point out on appeal, the experts who testified at the trial disagreed whether there was evidence of ricochet. We reject Foster’s argument that the prosecutor was claiming evidence of ricochet “didn’t exist.” Rather, 
 59 the context shows that the prosecutor highlighted the testimony of those “experts who examined [the] bullet and told [the jurors] there is no evidence of ricochet.” This is permissible because “closing argument allows advocates to point to different pieces of evidence and explain their significance within the case.” Domingo-Gomez, 125 P.3d at 1048. Similarly, defense counsel highlighted the opinions of those experts who testified there was evidence of ricochet. ¶ 128 Accordingly, to the extent the prosecutor misstated the evidence or injected her own purported expertise and personal opinion into her closing, the error was not plain. 4. The Prosecutor Did Not Denigrate the Defense ¶ 129 Foster contends that the prosecutor denigrated the defense when she argued that “the Defense wants to change the evidence in this case, so they can make that argument” about a ricocheted bullet. According to Foster, this statement attacked the integrity of defense counsel and implied that the defense was being presented in bad faith. We reject Foster’s strained interpretation of the prosecutor’s words. The prosecutor immediately followed this statement with an exhortation to the jury to “think thoughtfully and 
 60 carefully through that evidence to judge the credibility of that evidence as you evaluate the facts in this case.” ¶ 130 Reading the prosecutor’s statements in the context of her argument as a whole, and giving her the benefit of the doubt, see McBride, 228 P.3d at 221, the statement can be interpreted as a perhaps inartful rhetorical flourish commenting on the weakness of the evidence supporting the defense’s theory compared to the evidence supporting the prosecution’s case. 5. The Prosecutor Did Not Improperly Appeal to the Jury’s Emotions ¶ 131 Foster contends that the prosecution improperly appealed to the jury’s emotions when the prosecutors • described Roxine during opening statement as a “hardworking ranch woman who was murdered by her coldblooded husband”; • stated during closing argument that Roxine was a “[m]other, grandmother, [and] wife” who was “[u]nsuspecting” when she was “[s]hot in the back defenseless”; and 
 61 • calculated Roxine’s exact age at the time of her death and asserted that “she could still be alive talking to her children regularly, celebrating [her] grandson’s first birthday, celebrating every joy and milestone her family reaches.” ¶ 132 We agree with the People that these statements fall under the category of “rhetorical devices” and “oratorical embellishment,” People v. Samson, 2012 COA 167, ¶ 31, 302 P.3d 311, 317, which prosecutors may use to humanize a potentially unsympathetic victim. Indeed, the prosecutor devoted more of her closing argument to discussing Roxine’s flaws and how Foster was at a “breaking point” because of the way Roxine spoke to and treated him. Defense counsel similarly argued that the evidence showed that Roxine had “a bit of a temper.” ¶ 133 Read in context of the argument as a whole and in light of the evidence, the statements were not intended to induce the jury to determine Foster’s guilt on the basis of passion or prejudice. Rather, they evoked, in the prosecutor’s words, the “one thing [that] unite[d] almost every person in [the] courtroom” — the “belief that [Roxine] should not have lost her life.” 
 62 ¶ 134 Accordingly, we discern no error in the court’s allowance of such statements. 6. Although Some of the Prosecutor’s Statements Improperly Attacked Foster’s Credibility, There Was No Plain Error ¶ 135 Foster points to three instances during the prosecutor’s closing argument where he alleges the prosecutor improperly attacked his credibility. ¶ 136 As an initial matter, we note that there is no general prohibition against attacking a defendant’s credibility during closing argument. Such a prohibition would essentially prevent the prosecution from obtaining a conviction for any offense that includes an element of “deceit,” such as attempt to influence a public servant. § 18-8-306. Rather, the prohibition addresses inflammatory expressions such as “lie,” which risk communicating the lawyer’s personal opinion about the defendant’s credibility or improperly swaying the jury by evoking emotional reactions against the defendant. See Wend, 235 P.3d at 1096. Prosecutors also may not say in closing argument that evidence proves the defendant’s bad character — even if such evidence was properly admitted 
 63 during trial for a permissible use. See McBride, 228 P.3d at 223; CRE 404. ¶ 137 Foster first points to the prosecutor’s characterization of Foster as an “actor.” In response to defense counsel’s assertion that Foster consistently repeated the same story of Roxine’s death across twenty months, the prosecutor stated, “I suppose like most actors [Foster] was well capable of delivering performance, reciting lines as if he had memorized them for a play.” We reject Foster’s assertion that the statements were “synonymous” with, or “equally inflammatory” to, terms like “lie,” “deceit,” and “BS,” which courts have found to be improper. See People v. Serra, 2015 COA 130, ¶ 87, 361 P.3d 1122, 1138. However, characterizing Foster as an “actor” was an impermissible comment on his character. The prosecutor did not simply argue that Foster was “acting” or “performing” when Foster recounted Roxine’s death to the officers. Rather, the statements suggested that the jury could infer Foster was engaged in a performance in conformity to his character as an “actor” who “performs.” ¶ 138 Nevertheless, because the statements were not inflammatory and did not draw a contemporaneous objection, we are not 
 64 persuaded that this improper character attack was obvious or substantial, and it therefore did not constitute plain error. Cf. Domingo-Gomez, 125 P.3d at 1050-52 (disapproving of the prosecutor’s argument that the defendant “did not tell you the truth,” but explaining that such language did “not have the same degree of rhetorical power” as saying the defendant “lied,” and concluding that it did not fall “to the level of improper expressions of the prosecutor’s personal opinion”); People v. Mason, 643 P.2d 745, 752-53 (Colo. 1982) (expressing “strong disapproval” of the prosecutor’s references to the defendant as a “con man,” but concluding there was no plain error). ¶ 139 Second, Foster takes issue with the prosecutor’s discussion of the alleged attempt on Foster’s life. Although Foster contends that the prosecutor argued that Foster fabricated the alleged Wellington incident, the argument, read as a whole, suggests a different purpose. The prosecutor argued that the investigation into the “oft-
mentioned and never corroborated shootout in Wellington” led “[e]xactly nowhere”; Foster declined to “take some additional steps to possibly further this investigation”; and, as a result, the U.S. attorney in the federal case decided not to use Foster as a witness 
 65 against the Smiths. Even without Foster’s testimony in that case, the prosecutor argued, “it result[ed] in a successful prosecution, a plea deal of the Smiths. So, how key was [Foster] really to any of those events?” Thus, the prosecutor was not discussing the alleged Wellington events merely to attack Foster’s character, but rather to discredit Foster’s suggestion to officers that the Smiths may have been involved in Roxine’s death. ¶ 140 Finally, Foster argues the prosecutor improperly attacked his character when she highlighted Foster’s testimony in the civil case, “under penalty of perjury,” that he and Roxine were separated, and then asserted that “that’s some pretty compelling evidence of credibility as it reflects on [Foster].” We agree. ¶ 141 As discussed in Part II.B.3.b.i above, the evidence that Foster lied during the civil suit was relevant only by way of an impermissible propensity inference. The prosecutor’s statements during closing argument reaffirm that the prosecution intended that the evidence established that Foster had a bad character and acted in conformity with that character when he employed deceit to influence the investigation into Roxine’s death. However, we are not 
 66 convinced that the prosecutor’s reliance on the conformity inference was so obvious that the court should have interrupted the prosecutor’s argument and struck it from the record. Therefore, the error was not plain. 7. The Prosecutor’s Statement that Foster “Is Guilty” Was Not an Expression of Personal Opinion ¶ 142 In closing argument, the prosecutor stated, “Mr. Foster is guilty of the 1st degree murder of his wife, Roxine Foster. He’s guilty of attempting to influence [the officers].” According to Foster, the prosecutor “exceeded the bounds of permissible advocacy” by asserting that Foster “is guilty” because that “was a decision for the jury to make, unswayed by the prosecutor’s personal knowledge or opinion.” ¶ 143 We agree that a jury could infer a prosecutor’s express statement that a defendant “is guilty” as the prosecutor’s personal opinion. However, the context of the statement in the argument as a whole does not indicate that the prosecutor was attempting to “convey the impression that evidence not present to the jury, but known to the prosecutor, supports the charges against the defendant,” or to “induce the jury to trust the Government’s 
 67 judgment rather than its own view of the evidence,” as Foster argues, citing Wilson, 743 P.2d at 418-19 (quoting United States v. Young, 470 U.S. 1, 18-19 (1985)). The statement came at the conclusion of the prosecutor’s summation of the evidence, and immediately after the prosecutor exhorted the jury to “[e]xamine the evidence. Look at the credibility of the witnesses and the evidence that the People have put in front of you.” ¶ 144 Thus, we conclude that the statement was not “flagrantly, glaringly, or tremendously improper,” it does not cast serious doubt on the reliability of the jury’s verdict, and the court did not plainly err by allowing it. Domingo-Gomez, 125 P.3d at 1053 (quoting Avila, 944 P.2d at 676). D. Cumulative Error ¶ 145 Foster contends that, if we determine the trial court erred and that none of the errors requires reversal of his conviction, we should nevertheless reverse because of their cumulative prejudicial impact. “For reversal to occur based on cumulative error, a reviewing court must identify multiple errors that collectively prejudice the substantial rights of the defendant, even if any single error does not. Stated simply, cumulative error involves cumulative 
 68 prejudice.” Howard-Walker v. People, 2019 CO 69, ¶ 25, 443 P.3d 1007, 1011 (citation omitted). The relevant inquiry is “whether, viewed in the aggregate, the errors deprived the defendant of a fair trial.” Id. at ¶ 40, 443 P.3d at 1014. ¶ 146 We have identified one error that was harmless (admission of the uniform photos) and seven errors that were not plain because the errors were not obvious (admission of fifteen photos of Foster’s law enforcement paraphernalia; admission of testimony from Hammond, Bonino, and Wright suggesting that Foster lied to them; the prosecutor’s misstatements of evidence during closing argument; and the prosecutor’s characterization of Foster as an “actor” and specific assertion that he lied under oath during his deposition in the civil case). Additionally, we assume that the court erred (albeit not plainly) when it admitted the uniform-firearm and aimed firearm photos because the jury could have viewed those photos as establishing that Foster had a character for violence or aggression. ¶ 147 Although we do not condone these numerous errors, we hold that, even when considered in the aggregate, they did not deprive Foster of a fair trial. As explained below, the reliability of the 
 69 verdict is a product of the overwhelming evidence supporting the murder charge, independent from the errors and the logical connection between the murder charge and the charges for attempt to influence a public servant — if Foster is guilty of homicide, on the facts of this case, it follows that he also is guilty of the attempt to influence a public servant charges. This opinion should not be read to suggest that these errors would not cumulatively warrant reversal in the context of another case. ¶ 148 We initially note that most of these errors impermissibly highlighted Foster’s character for dishonesty. Because dishonesty is not an element of first degree murder, we are not convinced that the errors swayed the jury to convict Foster on that charge based on an impermissible propensity inference. Even if the jurors believed Foster had a propensity for lying, it is doubtful they would convict him of murder based on an inference that he was acting in conformity with his character for dishonesty. Thus, the only errors that had any bearing on whether Foster shot Roxine were the admission of the uniform-firearm and aimed firearm photos (which created the risk of portraying Foster as aggressive or violent) and 
 70 the prosecutor’s misstatements of the evidence during closing argument. ¶ 149 We are not convinced that the jury premised a guilty verdict on the five photos or the prosecutor’s misstatements of evidence because the admissible evidence strongly suggested that Foster shot Roxine: • A Colorado Bureau of Investigation firearm and toolmark expert testified at trial that the .22 bullet recovered from Roxine’s body was consistent with the Remington Yellowjacket style bullets that the officers found at the Fosters’ ranch. • The officers recovered a Colt M4 .22 caliber rifle from the back of Foster’s SUV. • Foster did not tell Norcross about the Colt M4 .22 caliber rifle when he listed his firearms. • Roxine was shot from the back. • The firearm and toolmark expert testified that she excluded as murder weapons the guns that officers collected from neighbors. 
 71 • Although some evidence suggested that the bullet recovered from Roxine’s body could not be conclusively linked to Foster’s Colt M4 .22 caliber rifle because it was significantly damaged, Foster does not point to any evidence suggesting that this rifle could be eliminated as the murder weapon. • Apart from the conflicts in the evidence regarding whether the bullet could have ricocheted before hitting Roxine and the evidence suggesting that the bullet had the potential to travel a mile and a half, no evidence admitted at Foster’s trial indicated that anyone other than Foster shot Roxine. • Following the shooting, investigating officers and volunteers conducted a fruitless search of the surrounding fields for evidence. • One officer testified that the tractor was not visible from the road adjacent to the property (where, according to defense counsel, someone could have fired the fatal shot). • All the alternate suspects had alibis. 
 72 ¶ 150 The convictions for attempt to influence a public servant necessarily flow from Foster’s murder conviction because it is undisputed that Foster told officers he did not shoot Roxine and suggested alternate suspects. Because the jury found that Foster shot Roxine (a decision that, as explained above, was unlikely influenced by any of the trial errors), it would be logical for the jury to find that Foster also deceived the officers when he told them he did not shoot her and suggested alternate suspects. Accordingly, the jury would not have relied on an impermissible character inference to convict Foster of these charges, even if numerous trial errors had the tendency to suggest such an inference. ¶ 151 In sum, although we have identified multiple errors, we conclude that their cumulative impact did not undermine the reliability of the verdict and did not prejudice Foster’s substantial rights by depriving him of a fair trial. III. Disposition ¶ 152 The judgment of conviction is affirmed. JUDGE FREYRE and JUDGE SCHUTZ concur.